*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0181P (6th Cir.)
File Name: 04a0181p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

BRIDGEPORT MUSIC, INC.;
WESTBOUND RECORDS, INC.,
*Plaintiffs-Appellants,*

SOUTHFIELD MUSIC, INC.;
NINE RECORDS, INC.,
*Plaintiffs,*

v.

DIAMOND TIME, LTD.,
*Defendant-Appellee,*

IRVING LORENZO, d/b/a DJ Irv
Music; TVT MUSIC, INC.;
TVT RECORDS, INC., a/k/a
Tee Vee Toons,
*Defendants.*

Nos. 03-5003/5656

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 01-00702—Thomas A. Higgins, District Judge.

Argued: April 28, 2004

Decided and Filed: June 18, 2004

2    *Bridgeport Music, Inc. v.*          Nos. 03-5003/5656
     *Diamond Time, et al.*

Before: GUY and GILMAN, Circuit Judges; BARZILAY,
Judge.*

_____

## COUNSEL

**ARGUED:** Richard S. Busch, KING & BALLOW,
Nashville, Tennessee, for Appellants. R. Horton Frank III,
STEWART, ESTES & DONNELL, Nashville, Tennessee, for
Appellee. **ON BRIEF:** Richard S. Busch, D'Lesli M. Davis,
KING & BALLOW, Nashville, Tennessee, for Appellants.
R. Horton Frank III, STEWART, ESTES & DONNELL,
Nashville, Tennessee, for Appellee.

_____

## OPINION

_____

RALPH B. GUY, JR., Circuit Judge. Plaintiffs, Bridgeport
Music, Inc., and Westbound Records, Inc., appeal from the
decision granting summary judgment to defendant Diamond
Time, Ltd., a copyright clearance company, on their claims of
common law negligence and copyright infringement
involving the use of samples in the rap release "4 My Click."
Plaintiffs argue that the district court erred both in finding
these claims were barred by the applicable statutes of
limitations and in rejecting equitable estoppel as a basis to
avoid the limitations bar. In a separate appeal, plaintiffs
challenge the post-judgment award of attorney fees and
nontaxable costs to Diamond Time as a prevailing defendant
under 17 U.S.C. § 505. No other parties or claims are before

_____

*The Honorable Judith M. Barzilay, Judge for the United States Court
of International Trade, sitting by designation.

us.[1] After review of the record and the applicable law, we find no error and affirm.

## I.

The claims against Diamond Time, a copyright clearance company, were initially asserted in a complaint filed May 4, 2001. That original complaint alleged nearly 500 counts against approximately 800 defendants for copyright infringement and other state law claims based on music sampling. "Sampling," common in rap, hip-hop, and urban music, typically involves making a digital copy from a master sound recording and using a piece in the making of a new work. Sound recordings and their underlying musical compositions are separate works with their own distinct copyrights. *Bridgeport Music, Inc. v. Still N The Water Publ'g*, 327 F.3d 472, 475 n.3 (6th Cir.), *cert. denied*, 124 S. Ct. 399 (2003).

The amended complaint, filed after the district court severed the initial pleading into 476 separate actions, alleged that the rap CD single "4 My Click" sampled from the composition "The Most Beautifullest Thing In the World (Green Eyed Remix)" ("The Most"), and from both the composition and sound recording "Funky Worm." Bridgeport Music claims to own copyrights in both music compositions, while Westbound Records claims to hold a copyright in only the sound recording "Funky Worm."[2]

---

[1] Southfield Music and Nine Records do not appeal. In the wake of a settlement with TVT Music and TVT Records, Bridgeport and Westbound voluntarily dismissed the appeal against all defendants except Diamond Time.

[2] Although it appears that the district court only partially resolved questions concerning the ownership interests of Bridgeport and Westbound Records, we assume for purposes of this appeal that Bridgeport and Westbound hold the copyrights they claim in "The Most"

Diamond Time's business included sample clearance services, which refers to the process of obtaining permission to use a sample in a new musical work. According to Diamond Time's website, it offered sample clearance services in two phases. The first included locating the copyright owners, requesting permission to use the sample, and negotiating the fees for its use. The second phase, called "Licensing/Contract Administration," included negotiating agreeable terms with the copyright holders; issuing a Usage Report confirming the terms and requesting a formal written agreement; and overseeing the trafficking, execution, and payment of those agreements.

Catherine Carapella, Diamond Time's representative, testified that when engaged to perform clearance services, Diamond Time's practice was to contact the proprietor or owner of the copyrights in the material its client wanted to use, identify itself and the client on whose behalf it was acting, describe the proposed use and ask for terms on which it would permit the use. The owner would normally advise Diamond Time of its terms and Diamond Time would seek the consent of its client. This would end phase one, at which time Diamond Time's client would decide how it wanted to proceed. The client then dictated what phase two services, if any, it would have Diamond Time undertake.

On January 24, 1995, TVT Records released the CD single containing three versions of "4 My Click" by the rap artists known as Cash Money Click. TVT Records owned the sound recording "4 My Click," while TVT Music and DJ Irv Music each held a 50% interest in the composition "4 My Click." TVT Records had a policy of requiring clearance of all samples in its releases and depended on the "creative types" to identify any samples in a new recording. TVT Records hired Diamond Time to handle clearance of the sample from

---

and "Funky Worm."

"The Most" in "4 My Click." Diamond Time maintains that it was not asked to obtain clearance for use of any other sample in "4 My Click."

In January 1995, on the same day that "4 My Click" was released, TVT Records obtained permission to use the sample "The Most" in "4 My Click" from Songs of Polygram. On October 3, 1995, Diamond Time representative Drea Kaplon wrote to Jane Peterer, the administrator for Bridgeport Music, seeking permission from Bridgeport to use the sample from the composition "The Most."[3] The letter states that she was

unaware, until this matter was well into the licensing process, that Zomba Music could only give clearance on the "green-eyed" version of "The Most Beautifullest Thing In The World" and that Bridgeport Music was a co-publisher on this song along with Zomba Music and PolyGram Music.

Accordingly, enclosed please find a cassette of both the new and sampled song for your review. We would like to obtain clearance for the use of "The Most Beautifullest Thing In The World (Green-eyed version)" in "4 My Click" from Bridgeport Music on a pro-rata basis with both Zomba and PolyGram Music as per the writer/publisher splits listed in the draft of the Zomba Publishing Agreement.

Jane, I look forward to your response so that we may finalize this in a timely manner. Please call me should you have any questions.

On November 20, 1995, Kaplon made a handwritten note on a copy of this letter and faxed it to Peterer. Kaplon's note

---

[3]Peterer was authorized to negotiate and agree to terms on which permission to use Bridgeport's copyrighted material would be granted.

stated: "Jane: Joan @ PolyGram has quoted 50% © pro-rata with Bridgeport. Is this o.k. with you? Please advise so we can wrap this matter up quickly. Zomba Music (who has some publishing on this as well) has agreed to go pro-rata. Thanks! Drea." Under this, also handwritten, is Peterer's response: "Ok, Jane Peterer, 11-20-95."[4] On November 27, 1995, Kaplon sent Peterer a Usage Report confirming the terms offered; indicating that Diamond Time's client, TVT Records, was proceeding in reliance on the quote; and requesting that Peterer prepare and forward a formal agreement directly to TVT Records.

On December 10, 1995, Peterer sent a formal agreement, called a Release and Agreement, directly to TVT Records for signature by TVT Music and DJ Irv Music. Under that co-publishing agreement, Bridgeport would receive an 8.33% interest in the composition "4 My Click." Peterer sent Kaplon a copy of the cover letter relating to this agreement on the belief that Diamond Time would continue to participate until the formal agreement and mechanical licenses were signed. Peterer placed a copy of that letter in a file of "pending matters," where it remained until her deposition in June 2002.

On the same day that the Release and Agreement was sent to TVT Records, Peterer faxed a separate request to Kaplon asking for information that was needed to prepare the mechanical license for TVT Records. Kaplon did not respond to that request. Diamond Time maintains that its involvement in the clearance process for "4 My Click" ceased once the Usage Report had been sent. Plaintiffs dispute this, arguing

---

[4]Peterer claimed that if she had been aware of the alleged sample from "Funky Worm," she would have demanded a higher percentage of ownership in "4 My Click" for Bridgeport as well as payment to Westbound for use of the sound recording. Plaintiffs indicate that, despite having been provided a tape of "4 My Click," they only discovered the alleged sample from "Funky Worm" in preparing to file this action.

that Diamond Time "dropped the ball" and failed to complete its assignment from TVT Records to oversee the trafficking and execution of the formal agreement. The district court did not attempt to resolve this dispute.[5]

Whatever the extent of the services Diamond Time had been engaged to provide in this case, Peterer admitted that she had no further written correspondence about "4 My Click" with either TVT Records or Diamond Time. The only contact Peterer claimed to have had occurred in several telephone conversations with Kaplon relating to "4 My Click" and other matters, during which Peterer urged Kaplon to see that the Agreement was signed. Peterer claims that she relied on Kaplon's assurances that she would "get the deal finalized." There is, however, no indication of when these conversations took place.

On September 5, 1996, TVT Records issued a Deletion Notice for a number of titles, including "4 My Click," which meant that no further copies would be manufactured or sold. The notice advised that requests for return of any of the listed products had to be made in writing no later than November 4, 1996, and that the products had to be received by TVT Records no later than January 10, 1997. The profit and loss

---

[5]Carapella testified that TVT Records had a modified arrangement with Diamond Time under which Diamond Time would provide phase one sample clearance services for a fee of $200 and would end its phase two work with the issuance of the Usage Reports for a fee of $40 each. She conceded, however, that she had no personal knowledge of the clearance work done on "4 My Click." In addition, when Kaplon left Diamond Time in 1997, no one took over her responsibilities until sometime in 1999. Diamond Time's physical file concerning "4 My Click" was destroyed in September 2000, along with other files from sample clearances from 1991 through 1995, to save on storage costs. Diamond Time was able to produce a computer-generated tracking grid for "4 My Click" which noted that Zomba had "waived phase two," but did not note as to Bridgeport or Polygram either that phase two was "waived" or that the job was "done."

statement for the artist Cash Money Click was prepared through December 31, 1998, in order to be sure that it included all sales and returns. TVT Records stated, however, that it did not receive any returns or unsold copies after April 1997. Plaintiffs argued that there must have been sales because the online service *All Music Guide* reported that "4 My Click" was still "in print" as of August 2000. Granting summary judgment to the TVT defendants, the district court found plaintiffs had failed to present evidence that any sales or returns had occurred after May 4, 1998. Plaintiffs' appeal from that decision was voluntarily dismissed as a result of a settlement reached between plaintiffs and the TVT defendants.

Diamond Time sought summary judgment on the grounds that it committed no acts of direct or contributory infringement, that it owed no duty on which the negligence claim could be based, that the negligence claim was preempted by the Copyright Act, and that both the copyright infringement and negligence claims were barred by the respective three-year statutes of limitations. Over plaintiffs' opposition, the district court granted summary judgment to Diamond Time on statute of limitations grounds.

Judgment was entered November 5, 2002, and plaintiffs appealed. On March 26, 2003, the district court granted Diamond Time's post-judgment motion for attorney fees and costs as a prevailing defendant under 17 U.S.C. § 505. *Bridgeport Music, Inc. v. Irving Lorenzo*, 255 F. Supp.2d 795 (M.D. Tenn. 2003). Plaintiffs appealed from that order as well.

## II.

The district court's decision granting summary judgment is reviewed *de novo*. *Smith v. Ameritech*, 129 F.3d 857, 863 (6th Cir. 1997). Summary judgment is appropriate when there are no genuine issues of material fact in dispute and the

moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). In deciding a motion for summary judgment, the court must view the evidence and reasonable inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party may not rest on his pleadings, but must come forward with evidence from which a rational trier of fact could find in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

## A. Copyright Infringement

Plaintiffs disavowed any claim that Diamond Time committed direct acts of infringement, but argued that Diamond Time was liable instead as a contributory infringer because its failure to shepherd the clearance process through execution of the written Release and Agreement materially contributed to the direct infringement by the TVT defendants. The district court did not determine whether the evidence could support a finding that Diamond Time was a contributory infringer, concluding instead that any such claim was barred by the statute of limitations because "there [was] no evidence in the record that defendant Diamond Time engaged in any acts whatsoever regarding '4 My Click' after May 4, 1998."

A civil action under the Copyright Act must be "commenced within three years after the claim accrued." 17 U.S.C. § 507(b). A cause of action accrues when a plaintiff knows of the infringement or is chargeable with such knowledge. *Roley v. New World Pictures, Ltd.*, 19 F.3d 479, 481 (9th Cir. 1994). Because each act of infringement is a distinct harm, the statute of limitations bars infringement claims that accrued more than three years before suit was filed but does not preclude infringement claims that accrued within the statutory period. *Id*; *Stone v. Williams*, 970 F.2d 1043, 1049-50 (2d Cir. 1992); *Hoste v. Radio Corp. of Am.*, 654

F.2d 11, 11 (6th Cir. 1981) (per curiam); *Mount v. Book-of-the-Month Club, Inc.*, 555 F.2d 1108, 1110-11 (2d Cir. 1977).

Contributory infringement occurs when one, "with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another." *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971); *see also Ellison v. Robertson*, 357 F.3d 1072, 1076 (9th Cir. 2004). Liability for contributory infringement is based on the defendant's relationship to the direct infringement. *Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 732-33 (S.D.N.Y. 1996). There can be no contributory infringement without a direct infringement. *Matthew Bender & Co. v. West Publ'g. Co.*, 158 F.3d 693, 706 (2d Cir. 1998); *Subafilms, Ltd. v. MGM-Pathe Communications Co.*, 24 F.3d 1088, 1092 (9th Cir. 1994).

## 1. Statute of Limitations

Conceding that Diamond Time took no actions within the period, plaintiffs argue for the first time on appeal that their claims against Diamond Time are not time-barred because TVT Records committed acts of direct infringement within the limitations period to which Diamond Time's earlier conduct materially contributed. The short answer is that the district court found plaintiffs had failed to present evidence of any direct infringement by TVT within three years preceding the filing of the complaint. Without proof of direct infringement, there can be no liability for contributory infringement.

Even if there was evidence of direct infringement within the period, however, plaintiffs may not "piggy back" Diamond Time's conduct from outside the period onto the alleged direct infringement of another within the period. Just as claims against a direct infringer who commits no acts within the three-year limitations period are time barred, claims

against a contributory infringer who commits no acts within the limitations period are also time barred. This is not a new proposition, as the discussion in *Mount v. Book-of-the-Month Club* makes clear.

There, the publisher of the plaintiff's book sent proof copies to the defendant Book-of-the-Month Club so it could decide if it wanted to adopt the work for the club. The defendant gave the copy to someone it hired to read incoming work, who turned it over to a friend, David McKibbin. McKibbin, in turn, allegedly infringed the copyright in the book by copying material in a pamphlet he wrote on the same subject. The pamphlet continued to be sold within the limitations period. The Second Circuit concluded that claims against the book club were barred by the statute of limitations, explaining:

> We need not consider whether defendant could escape liability simply because the reader to whom it sent the proofs of plaintiff's work was an independent contractor. In any case the claim is foreclosed by limitations. Even if defendant participated in an infringement through the sending on of the proofs to McKibbin, that event occurred in the Fall of 1955, almost twenty years before this action was begun. There is no proof or allegation of any further connection of Book-of-the-Month with McKibbin's pamphlet. Unless the statute's running has been tolled or prolonged, the claim is undoubtedly long since time-barred.

555 F.2d at 1110.

Although plaintiffs deny it, their argument rests essentially on a "continuing wrong" theory. That is, they argue that the defendant's conduct outside the limitations period contributed to direct infringement by another party within the limitations period. The Fifth Circuit rejected a similar argument in *Makedwde Publishing Co. v. Johnson*, 37 F.3d 180, 182 (5th

Cir. 1994), and declined to follow the lead of the Seventh Circuit in *Taylor v. Meirick*, 712 F.2d 1112, 1118-19 (7th Cir. 1983). The defendant in *Makedwde*, Lyman Jones, participated in the alleged copyright infringement but completely terminated his connection to the infringing defendants outside the three-year limitations period. The plaintiff reasoned that claims against Jones should not be time barred because his actions outside the period led to subsequent acts of infringement by others within the period. Rejecting this argument and following the lead of *Hoste*, *Stone*, and *Roley*, the court concluded Jones could only be held liable for *his* acts of infringement committed within three years before suit was filed. *Makedwde*, 37 F.3d at 182.

Similarly, we find no error in the district court's determination that the copyright infringement claims are barred by the statute of limitations absent a showing that defendant should be equitably estopped from relying on the limitations bar.

## 2.   Equitable Estoppel

Equitable estoppel, sometimes referred to as fraudulent concealment, is invoked in cases where the defendant takes active steps to prevent the plaintiff from suing in time, such as by hiding evidence or promising not to plead the statute of limitations. *Hentosh v. Herman M. Finch Univ.*, 167 F.3d 1170, 1174 (7th Cir. 1999); *EEOC v. Ky. State Police Dep't*, 80 F.3d 1086, 1095 (6th Cir. 1996); *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450-51 (7th Cir. 1990). Application of equitable estoppel "'should be premised on a defendant's improper conduct as well as a plaintiff's actual and reasonable reliance thereon.'" *Hentosh*, 167 F.3d at 1174 (citation omitted).

In the district court, plaintiffs asserted fraudulent concealment as the basis for equitable estoppel. *Hill v. United States Dep't of Labor*, 65 F.3d 1331, 1335 (6th Cir.

1995); *Prather v. Neva Paperbacks, Inc.*, 446 F.2d 338, 340-41 (5th Cir. 1971). On appeal, however, plaintiffs have shifted their equitable estoppel claim to argue that defendant's misconduct "lulled [them] into believing that it was not necessary for [them] to commence litigation." *Cerbone v. ILGWU*, 768 F.2d 45, 50 (2d Cir. 1985). *See also Buttry v. Gen. Signal Corp.*, 68 F.3d 1488, 1493 (2d Cir. 1995); *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1316-18 (S.D.N.Y. 1997).[6]

Specifically, plaintiffs contend that they were lulled into delaying suit by the assurances Peterer received during several telephone conversations with Kaplon at unspecified times after December 10, 1995. To invoke equitable estoppel, a plaintiff must "demonstrate that his ignorance is not attributable to a lack of diligence on his part." *Netzer*, 963 F. Supp. at 1316. Accepting for purposes of this appeal that Kaplon said more than once that she would see the written agreement was signed, nothing at all happened after the Agreement was sent to TVT Records on December 10, 1995. Plaintiffs cannot establish that it was reasonable to rely on these empty assurances to forego litigation until more than five years after the Agreement had been forwarded to TVT for signature. *See*, *e.g.*, *Buttry*, 68 F.3d at 1494; *Weber v. Geffen Records, Inc.*, 63 F. Supp.2d 458, 466-67 (S.D.N.Y. 1999) (no equitable estoppel because plaintiff had unreasonably relied on an "unexceptional string of empty promises" to remedy infringements and protracted negotiations to implement those promises). Accordingly, plaintiffs failed to demonstrate that Diamond Time should be equitably estopped

---

[6]At one point, plaintiffs seem to argue that the "Funky Worm" sample was fraudulently concealed. The claims against Diamond Time, however, rest on its failure to get the agreement signed concerning the use of the sample from "The Most" in "4 My Click." Plaintiffs, who bear the burden of proof, presented no evidence that could lead one to conclude Diamond Time either knew of, or undertook to clear, any sample other than "The Most" in "4 My Click."

from relying on the limitations period as a bar to their claims of copyright infringement.

## B. Negligence

The parties agree that New York law applies to plaintiffs' common law negligence claim against Diamond Time. The statute of limitations for negligence claims under New York law is three years from accrual of the cause of action. N.Y. C.P.L.R. § 214 (McKinney 1996). Without deciding whether there was a duty or whether such a claim would be preempted by the Copyright Act, the district court found any such claim was long barred by the statute of limitations.

This negligence claim rested on the theory that Diamond Time owed a legal duty to plaintiffs that arose from a "dual agency" relationship analogous to that of a real estate agent working for both buyer and seller, or an insurance broker working for both the insurer and the insured. Out of this alleged "dual agency" relationship, plaintiffs argue, arose a legal duty, owed to the copyright holders, to complete the clearance process and to notify the copyright holders when its involvement in the clearance process concluded. Plaintiffs assert that the following passage represents an implicit finding that such a duty arose in this case.

> The plaintiffs allege that Ms. Peterer contacted Diamond Time on or about December 10, 1995, requesting specific information needed to prepare the mechanical licenses for use of "Most," and that Diamond Time never responded. The Court finds that Bridgeport's cause of action accrued shortly thereafter. Bridgeport was clearly put on notice that Diamond Time was no longer working on its behalf to procure the signed agreements when Diamond Time failed to respond to its request for necessary information. Adding a generous period of time for Diamond Time to respond, the Court finds that the negligence claim accrued on or about January 10, 1996,

and that the limitations period for the negligence claim expired January 10, 1999.

The only fair reading of this discussion is that the district court assumed without deciding that a duty could be established, and found that any negligence claim based on such a duty would be barred by the statute of limitations. This conclusion is further supported by the district court's observation in the order awarding attorney fees and costs that: "The plaintiffs have never cited any case law with analogous facts from which the Court could conclude that any legal duty of care was owed to the plaintiffs by the defendant, who was hired by a third party to perform its clearance work." *Bridgeport*, 255 F. Supp.2d at 798 n.2.

Similarly, we need not decide whether New York law would recognize a legal duty owed to plaintiffs in this case. Whether or not plaintiffs could ultimately prevail on their negligence claim against Diamond Time, such a claim would be barred because it was filed more than three years after it would have accrued. In the alternative, plaintiffs again rely on equitable estoppel to argue that the representations allegedly made by Kaplon "induced" or "lulled" them into believing that litigation was not necessary. For the same reasons discussed earlier, we find that plaintiffs failed to demonstrate that Diamond Time should be equitably estopped from asserting the statute of limitations with respect to their claim of negligence. Accordingly, we affirm the district court's grant of summary judgment to Diamond Time.

## III.

Having affirmed the district court's decision on the merits, we turn to plaintiffs' further appeal from the decision awarding $64,371.23 in attorney fees and $963.00 in nontaxable costs in favor of Diamond Time and against Bridgeport and Westbound, jointly and severally. The district court's decision to award costs and fees is reviewed for abuse

of discretion. *Coles v. Wonder*, 283 F.3d 798, 804 (6th Cir. 2002); *Murray Hill Publ'ns, Inc. v. ABC Communications, Inc.*, 264 F.3d 622, 639 (6th Cir. 2001). A district court abuses its discretion when it relies on clearly erroneous factual findings, improperly applies the law, or uses an erroneous legal standard. *Adcock-Ladd v. Sec'y. of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).

The Copyright Act provides that the court in its discretion may allow the award of costs and reasonable attorney fees to the prevailing party in civil suits under the Act. 17 U.S.C. § 505.[7] Plaintiffs argue at the outset that Diamond Time is not a prevailing party because it did not "prevail" on the issue of preemption or the question of duty with respect to the common law negligence claim. First, when a defendant succeeds in having summary judgment entered in its favor on the copyright infringement claims asserted against it, that defendant can only be described as having "prevailed." Second, the district court properly deducted 20% of the reasonable attorney fees incurred in this action to account for fees incurred in defense of the common law negligence claim. Finally, as noted earlier, the district court did not decide the issues of preemption or duty in granting summary judgment to Diamond Time.

The discretion to grant attorney fees in copyright infringement cases is to be exercised in an evenhanded manner with respect to prevailing plaintiffs and prevailing defendants, and in a manner consistent with the primary purposes of the Copyright Act. *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994). The Supreme Court squarely rejected what

---

[7]"In any civil action under this title, the court in its discretion may allow the recovery of full costs by or against any party other than the United States or an officer thereof. Except as otherwise provided by this title, the court may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505.

it called the "dual standard" under which prevailing plaintiffs recovered attorney fees as a matter of course but prevailing defendants were required to show the claims were frivolous or were brought in bad faith. *Id*. at 534. At the other extreme, the Court also rejected the view that § 505 was intended to enact the "British Rule" of automatic recovery of attorney fees by the prevailing party. *Id*. Thus, the Court explained that "'[t]here is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised 'in light of the considerations we have identified.'" *Id*. (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 436-37 (1983)).[8]

In closing, the *Fogerty* Court identified several nonexclusive factors that may be considered in making awards to prevailing parties, as long as the factors are "faithful to the purposes of the Copyright Act and are applied to prevailing plaintiffs and defendants in an evenhanded manner." *Id*. at 534 n.19. Those factors include "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. (quoting *Lieb v. Topstone Indus., Inc.*, 788 F.2d 151, 156 (3d Cir. 1986)).

## A. Decision to Grant Attorney Fees

The district court in this case correctly observed that because the *Fogerty* factors are nonexclusive, not every factor must weigh in favor of the prevailing party and other factors may be considered as well. Concluding that attorney fees and costs should be granted to Diamond Time "in the interest of justice and in furtherance of the objectives of the Copyright Act," the district court explained that:

> the following factors . . . weigh in favor of an award: (1) the plaintiffs' litigation strategy that resulted in suing defendants against which they had little hope of recovering; (2) the plaintiffs' motivation for failing to dismiss stale claims; (3) the interest in deterring further litigation of stale claims; and (4) the inherent weakness in the plaintiffs' copyright claims against this defendant. These factors dictate that the plaintiffs should be made to answer for litigating this action, and the original action from whence it spawned, in a fashion that contributed to the multiplication of fees amongst all the parties and resulted in an administrative morass for the Court.

> One of the consequences of the plaintiffs' choice to sue hundreds of defendants all at the same time, regardless of the strength of the individual claims, was that the plaintiffs' dragnet inevitably swept up parties against whom they had little or no chance of succeeding. Such is the case here. While the ultimate decision to dismiss the claims against this defendant rested on the statute of limitations, the plaintiffs' claims for contributory infringement and negligence were based on shaky facts and even shakier legal arguments. In response to the defendant's motion for summary judgment, the plaintiffs conceded that they had no claim for direct infringement. Their claim for contributory infringement rested on few facts and on case law that was not factually analogous.

---

[8]Those considerations include: the primary objective of the Copyright Act to "encourage the production of original literary, artistic, and musical expression for the good of the public"; the fact that defendants as well as plaintiffs may hold copyrights and run the gamut from large corporations to "starving artists"; the need to encourage "defendants who seek to advance a variety of meritorious copyright defenses . . . to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement"; and the fact that "a successful defense of a copyright infringement action may further the policies of the Copyright Act every bit as much as a successful prosecution of an infringement claim by a holder of a copyright." *Id*. at 524 and 527.

While the Court did not reach the merits of the contributory infringement claim, the significance of the statute of limitations defense to this and numerous other Bridgeport cases must be underscored. Many of the songs in question were released in the early and mid 1990's. Many of these cases involve license agreements that were initially negotiated between the plaintiffs and defendants during this same time period. Yet the plaintiffs waited long after the three-year statute of limitations to bring suit. The Court found in this case that the last contact between Diamond Time and the plaintiffs was in December 1995, more than five years before the plaintiffs brought suit. This is not the only Bridgeport case where the plaintiffs' claims were defeated by their failure to act promptly to protect their rights.

The plaintiffs complained repeatedly that the dilatory practices of the music industry, resulting in license agreements never or belatedly being signed and payments never or belatedly being made, allowed the defendants in these cases to abuse the plaintiffs' position as a small company and flagrantly use their copyrighted works without proper compensation. The plaintiffs claim that they did not bring suit in a more timely fashion because these practices kept them from enforcing their rights. The Court sees little merit to this argument (and in fact wholly rejected in this case the argument that these practices amounted to a legal justification for avoiding the statute of limitations).

If their copyrights are as valuable as the plaintiffs claim, then it behooves them to police their rights and seek legal redress in a timely fashion, especially where their opponents are huge entertainment conglomerates that may not respond to any other pressure than the threat of a suit. And in the case of those defendants like Diamond Time that have limited operations or financial

resources, timely filing of legal action against them would increase the chance that the case is decided on the merits of the claim and not subject to the vagaries of missing documents, faulty recollections and absent witnesses.

The plaintiffs' failure to weed out stale claims means that there remain in these cases numerous claims and defendants that will never make it to trial. The Court must infer from the plaintiffs' actions that these claims remain for the sole purpose of extracting a settlement based on the cost of litigating further. This is not an objective to be promoted under the Copyright Act; to the contrary, the Court sees an opportunity here to deter further misuse of the Court's resources and encourage the prompt dismissal of clearly stale claims in the hundreds of Bridgeport cases that remain before this Court.

255 F. Supp.2d at 798-99 (footnotes omitted).

Plaintiffs accuse the district court of "palpable hostility" toward the legitimate copyright claims asserted in other *Bridgeport* cases, in which no discovery has even been conducted, and an intention to punish plaintiffs for bringing all of their claims together. While the district court certainly did not mince words, the harsh criticism of the plaintiffs' litigation strategy was clearly focused on the resulting failure of plaintiffs to weed out stale claims against defendants like Diamond Time.[9]

Urging that we reverse the award, plaintiffs compare this case to *Murray Hill*, where the district court granted attorney

---

[9] Plaintiffs complain that the harsh criticism makes them doubt that they are being treated evenhandedly with the defendant. Of course, *Fogerty* was concerned that courts be evenhanded in their treatment of *prevailing* plaintiffs and *prevailing* defendants; not losing plaintiffs and prevailing defendants.

fees to the prevailing defendant because the plaintiff's claims were "utterly devoid of merit" and the voluminous case was burdensome to both the defendant and the court. 264 F.3d at 639. This court reversed, without much discussion, concluding that the case presented unsettled questions of law and one or more colorable claims of infringement. *Id*. at 640. When a plaintiff has advanced a reasonable, yet unsuccessful position, an award of attorney fees to the prevailing defendant generally does not promote the purposes of the Copyright Act. *Matthew Bender & Co.*, 240 F.3d 116, 122 (2d Cir. 2001); *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 75 (1st Cir. 1998) (In close infringement cases, "the need to encourage meritorious defenses is a factor that a district court may balance against the potentially chilling effect of imposing a large fee award on a plaintiff[] who . . . may have advanced a reasonable, albeit unsuccessful, claim.").

In this case, however, there can be no doubt that the district court found it was objectively unreasonable for plaintiffs to have argued that the claims against Diamond Time were not time barred. In commenting on the factual and legal weakness of the plaintiffs' contributory infringement claims, the district court clearly criticized the plaintiffs' decision to sue hundreds of defendants at once without regard to the strength of the various claims.[10]

In addition, the district court inferred from the way the case was commenced and the fact that plaintiffs continued to prosecute this case against Diamond Time that the claims remained "for the sole purpose of extracting a settlement based on the cost of litigating further." *Bridgeport*, 255 F.

---

[10]To bolster their challenge, plaintiffs suggest the award in this case is inconsistent with the denial of attorney fees to the prevailing defendant in another *Bridgeport* case in which a novel claim was found to be objectively reasonable. The same issue was neither presented nor decided with respect to the claims against Diamond Time.

Supp.2d at 799. Although plaintiffs deny such motivation, the district court certainly had a basis to infer that the litigation was undertaken and prosecuted in a fashion that would multiply the fees and encourage nuisance settlement. We can find no clear error in this regard.

Finally, the district court explicitly relied on deterrence, a factor that has an unusual role in this case. Despite plaintiffs' hyperbole about the district court's desire to "close the courthouse door" to its legitimate, albeit novel, copyright infringement theories, the district court was concerned with deterring misuse of the court's resources and encouraging the prompt dismissal of clearly stale claims in the hundreds of pending *Bridgeport* cases. Given the common origin of the pending cases and the possibility that similar strategies and motivations may be at work with respect to at least some of the asserted claims, deterrence is a particularly relevant factor in this case weighing in favor of an award of attorney fees.

### B.    Reasonableness of Award

Finally, having determined that an award of attorney fees was warranted, the district court made an independent review of the billing statements and determined that the initial "lodestar" amount, representing reasonable attorney fees incurred by Diamond Time in this case, was $80,464.04. That amount was then reduced by 20% to account for fees incurred with respect to the negligence claim only. As a result, the district court awarded $64,371.23 in attorney fees to Diamond Time.

Plaintiffs do not challenge the calculation of this amount, but argue that it is unreasonable because it does not account for the defendant's unwillingness to settle. The district court rejected this argument, explaining that:

The deadline for filing dispositive motions in this case was June 21, 2002. The plaintiffs' initial settlement

demand was not made until September 30, 2002. The plaintiffs cannot be heard now to complain that the defendant did not settle in a timely manner when the first offer to settle was not made until three months after the dispositive motion deadline, and just two months prior to trial, at which point the defendant had already incurred almost two-thirds of the amount of attorney's fees it now seeks.

255 F. Supp.2d at 801-02. Plaintiffs contend that because this conclusion rested on incorrect or incomplete facts concerning their first offer to settle, the district court abused its discretion in refusing to further reduce the amount of attorney fees.

First, plaintiffs argue that the district court "obviously overlooked" the short declaration submitted by their attorney, Richard Busch, in which he stated that defendant's counsel, Horton Frank, rebuffed an attempt to settle all the claims against Diamond Time in June 2002. That declaration specifically states that Busch approached Frank during a break in depositions sometime in June 2002 and offered to dismiss the claims for "a very minimal amount of money." Frank apparently replied that plaintiffs would have to agree to dismiss the claims with prejudice and to pay all or part of Diamond Time's attorney fees and costs. It is true that the district court did not mention this oral exchange in its opinion. The court also did not mention the letters dated April 8, 2002, and July 31, 2002, in which defendant's counsel asked that plaintiffs make a settlement demand. In the April letter, defendant's counsel conveyed both that Diamond Time had limited financial resources and that it had begun incurring expenses in preparation of its dispositive motion. The letter also stated that:

> At the case management conference, Judge Higgins made it very clear that he expected you to "put a price on your horse" and to let the Defendants in the case know what the price was for purposes of settlement. If you intend to

do so, I ask that you take what I have told you in this letter into account. If you do not intend to do so, my client will simply move forward and continue to defend the litigation.

Plaintiffs did not respond except by making the informal offer in June 2002. On July 31, 2002, Frank wrote to plaintiffs' counsel as a "follow up" to that exchange and expressed willingness to discuss settlement. On September 30, 2002, plaintiffs made its first written offer to dismiss all the lawsuits against Diamond Time for payment of $20,000.[11]

Despite the failure of the district court to discuss plaintiffs' oral offer to settle for "a very minimal amount," we find no abuse of discretion in the district court's refusal to reduce the amount of the attorney fees to account for defendant's unwillingness to settle. Defendant did not display unwillingness to discuss settlement, only an unwillingness to pay plaintiffs money it did not have, in order to settle claims it believed would be dismissed with prejudice, when it had already incurred significant attorney fees in defending itself. *Cf. Diamond Star Bldg. Co. v. Freed*, 30 F.3d 503, 506-07 (4th Cir. 1994) (reversing denial of attorney fees and finding it an abuse of discretion to penalize the prevailing defendant for refusing to admit liability and pay to settle a frivolous action).

---

[11]Frank responded in a lengthy letter dated October 14, 2002, explaining that Diamond Time had no money to pay plaintiffs and had already incurred nearly $60,000 in attorney fees; that Diamond Time expected to prevail on summary judgment and would seek attorney fees under *Fogerty*; and that Diamond Time would settle if plaintiffs agreed to pay the fees incurred in this case. On October 24, 2002, Busch rejected this offer as unrealistic and commented that it "seems tragic to me that there have been $60,000 worth of attorney's fees charged to Diamond Time for engaging in motion practice when all matters could have been settled for less than that amount." No further counter-offer was made in that letter, and the summary judgment orders were entered shortly thereafter.

In concluding that the attorney fees incurred by defendant were reasonable, the district court noted that Diamond Time was represented by only a single copyright attorney and that Diamond Time had limited its discovery and motion practice due to its limited financial resources. Plaintiffs, on the other hand, "chose to litigate aggressively each and every issue against each and every defendant, regardless of a particular defendant's resources or the strengths of the claims against it. The fees incurred by the defendant here were justified and necessary to guard against the plaintiffs' take-no-prisoners tactics." *Bridgeport*, 255 F. Supp.2d at 802.

**AFFIRMED.**