*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 07a0229p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

HAMILTON COUNTY BOARD OF COMMISSIONERS,
　　　　　　　　　　　*Plaintiff-Appellant,*

　　　　*v.*

NATIONAL FOOTBALL LEAGUE, et al.,
　　　　　　　　　　　*Defendants-Appellees.*

No. 06-3348

---

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 03-00355—S. Arthur Spiegel, Sr., District Judge.

Argued: April 24, 2007

Decided and Filed: June 19, 2007

Before: SUHRHEINRICH, SUTTON, and McKEAGUE, Circuit Judges.

---

## COUNSEL

**ARGUED:** Arthur R. Miller, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Appellant. Gregg H. Levy, COVINGTON & BURLING, Washington, D.C., for Appellees. **ON BRIEF:** Arthur R. Miller, HARVARD LAW SCHOOL, Cambridge, Massachusetts, Stanley M. Chesley, Paul M. De Marco, Fay E. Stilz, W. B. Markovits, WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., Cincinnati, Ohio, Robert R. Furnier, FURNIER SIMONDS, LLC, Cincinnati, Ohio, for Appellant. Gregg H. Levy, James M. Garland, Steven E. Fagell, COVINGTON & BURLING, Washington, D.C., Robert A. Pitcairn, Jr., KATZ, TELLER, BRANT & HILD, Cincinnati, Ohio, Kenneth F. Seibel, JACOBS, KLEINMAN, SEIBEL & McNALLY, Cincinnati, Ohio, for Appellees.

---

## OPINION

---

　　　SUTTON, Circuit Judge. This case presents the latest twist in the relationship between the City of Cincinnati and professional football, a relationship that spans 86 years and at least 3 stadiums, the third of which is the subject of this controversy. The Hamilton County Board of Commissioners sued the defendants—the Cincinnati Bengals, the National Football League and its 31 other teams—claiming that they violated the federal antitrust laws by using a monopoly over

1

professional football to obtain a heavily subsidized lease for the Bengals' newly built, football-only stadium at the expense of Hamilton County and its taxpayers.

The district court concluded that the statute of limitations bars the claim. Because Hamilton County filed this lawsuit after the four-year limitations period had run, because the County has failed to demonstrate that the limitations period should be tolled due to the defendants' allegedly fraudulent concealment of material information regarding the antitrust claim and because the district court did not abuse its discretion in denying the County's Civil Rule 56(f) motion for additional discovery, we affirm.

I.

Long before Ickey Woods shuffled across the end zone, long before Kenny Anderson and Boomer Esiason led the Bengals to Super Bowls XVI and XXIII (a team from another circuit, the San Francisco 49ers, won both games), football fans along the Ohio river cheered for the Cincinnati Celts. Started in 1921 as a member of the nascent American Professional Football Association, the city's first professional football team finished with a 1-3-0 record that year, its one and only season in the Queen City. *See* Cincinnati Pro Football History, *available at* http://www.bengals.com/team/history/cincinnati_history.asp (last visited June 13, 2007). Whether for want of a stadium or not, the Cincinnati Celts played all four of their games that season on the road. So far as professional football was concerned, that was it for 12 years.

What began as the American Professional Football Association in 1920 became the National Football League in 1922. In 1933, the NFL brought a new team to town. Named the Cincinnati Reds, this *football* team lasted two seasons before folding. *Id.* Four years later, a rival league, the American Football League (AFL), gave Cincinnati its first "Bengals" team, which played in the league for one season, then played as an independent team for a season after the AFL folded. *Id.* The AFL emerged anew in 1939, and the Bengals played in the league for a season before the AFL folded anew. *Id.* After the AFL experienced yet another rebirth, the Bengals played for two additional seasons. But when World War II forced the AFL to fold in 1941, so too did the Bengals—for another 26 years. *Id.*

In 1967, Paul Brown, the founder and first head coach of the Cleveland Browns, brought modern professional football to Cincinnati through an AFL-expansion franchise. Although suggestions for team names came pouring in (one was the Cincinnati Buckeyes), Brown opted to use the "Bengals" because it provided "a link with past professional football in Cincinnati." *Id.* The team played its first season in 1968, became a member of the NFL when the two leagues merged in 1970 and has been playing in Cincinnati ever since.

The modern-day Bengals have played in three different home stadiums. (True fans do not speak of football "stadia.") From 1968 to 1969, the team played at Nippert Stadium, where the largest crowd on record totaled 28,642 fans. *See* Bengals Stadium Firsts & Lasts, *available at* http://www.bengals.com/team/history/stadium_firsts.asp (last visited June 13, 2007). The Bengals played their first game at Riverfront Stadium (later renamed Cinergy Field) on August 8, 1970, a stadium it shared with baseball's Cincinnati Reds, and their last game there on December 12, 1999. The biggest crowd—60,284—came during an October 1971 match-up between the Bengals and their in-state rivals, the Cleveland Browns. *Id.*

On August 19, 2000, the Bengals opened their first season at Paul Brown Stadium, *id.*, which sits along the northern side of the Ohio River in Hamilton County (which includes Cincinnati), covers 22 acres, stands 157 feet tall, features 65,535 seats and presumably has ample luxury box seats. *See* Paul Brown Stadium, *available at*

http://www.bengals.com/stadium/paulbrownstadium.asp (last visited June 13, 2007). The team finished its first season in the new stadium with a losing record (4-12-0), but it is Hamilton County that claims it was the real loser because it signed a lease with the Bengals for the stadium that it now calls "unconscionable." Second Amended Complaint ¶ 49.

To understand this charge and the climate in which it was made, we need to backpedal a few steps. After the NFL awarded expansion teams to Charlotte and Jacksonville in 1993, the three cities that failed to obtain a team (Baltimore, Memphis and St. Louis) tried to lure existing teams from their existing cities. Several teams—the Bengals among them—capitalized on this environment, threatening to leave their host cities unless they obtained a new stadium.

Claiming that his team could not remain competitive without a new stadium because Riverfront Stadium has "virtually no luxury seating and the league's smallest seating capacity," JA 2579, Bengals' owner Mike Brown (the son of Paul Brown) threatened to move the team if Cincinnati or Hamilton County would not build a new stadium. At an owners' meeting in 1995, Brown announced that Cincinnati had breached its lease agreement when it was late by one week in paying $167,000 in concession receipts. According to Brown, this breach entitled the Bengals to relocate to a different city.

At an owners' meeting the following month, Brown declared that if the city failed to provide the team with a new stadium, the Bengals would consider moving to Los Angeles. Brown later visited Baltimore, which offered to build the team a $200 million stadium with a practice facility and a pledge of $44 million in income.

On June 24, 1995, Brown gave Cincinnati what amounted to an ultimatum: If the city did not agree to a new stadium deal within five days, the Bengals would start negotiating with Baltimore. Cincinnati's City Council and the Hamilton County Commissioners relented, opting to fund the new stadium with a proposed county sales-tax increase. In March 1996, the sales-tax referendum passed with 61% support.

During negotiations over the new stadium lease, the County retained two national experts in developing and leasing professional-sports stadiums. As negotiations proceeded, it became clear to the County that the Bengals' goal was to acquire sufficient revenue under the new lease to move the team from the last quartile of NFL teams in revenue to the second quartile. County officials asked to see the Bengals' financial records during the negotiations but the team refused, explaining that the disclosure of this information would violate league policy. The parties executed a lease for the new stadium in May 1997.

Four years later, in May 2001, the *Los Angeles Times* published an article disclosing the revenues and profits of NFL teams, which it had obtained from the record in a lawsuit between the NFL and the owner of the Oakland Raiders. The data showed that the Bengals ranked eighth in profits in 1996 and ninth in 1997 out of 31 teams.

On May 16, 2003, six years after the parties signed the stadium lease, Hamilton County Commissioner Todd Portune (a former Cincinnati City Council member, though not a Hamilton County Commissioner at the time the parties executed the lease), filed this lawsuit in federal district court against the NFL, the Bengals and the other 31 NFL teams. The Hamilton County Board of Commissioners eventually was substituted as the plaintiff in the case.

The second amended complaint alleges that the defendants violated § 1 of the Sherman Act, *see* 15 U.S.C. § 1, by engaging "in a contract, combination or conspiracy in restraint of trade," precluding Hamilton County and others who sell or lease stadiums from being able to obtain

"competitive prices" for their "products and services." Second Amended Complaint ¶ 41. It also alleges that the defendants violated § 2 of the Sherman Act, *see* 15 U.S.C. § 2, because their "monopoly power in the professional football market" allowed them to "foreclose competition and gain a competitive advantage in the NFL stadia market." Second Amended Complaint ¶ 42. It also alleges that the Bengals and the NFL continuously "misstated and concealed their financial position from 1995 until the present day," making "affirmatively fraudulent or misleading statements regarding the Bengals' financial position that would necessitate moving the team to another locale." Second Amended Complaint ¶ 58. As relief, Hamilton County asked the district court to void the stadium lease, to award it in excess of $200 million in compensatory and punitive damages and to treble the compensatory-damages award. *See* 15 U.S.C. § 15(a).

The defendants filed a motion to dismiss the complaint, arguing that the four-year statute of limitations had run on the claims. In ruling on the motion, the district court determined that any injury Hamilton County suffered "occurred when the lease was executed" in May 1997, D. Ct. Op. at 68, that the execution of the lease triggered the start of the four-year statute-of-limitations period and that the plaintiff filed suit two years after the limitations period had expired. It nonetheless denied the motion, reasoning that Hamilton County should be permitted discovery to support its theory that the limitations period should be tolled.

For the next two years or so, discovery proceeded in fits and starts and was suspended for a time while the parties tried to mediate their dispute. After the mediation effort failed and after the parties had conducted initial discovery, the district court granted the defendants' motion for summary judgment on the statute-of-limitations issue, denied the County's Rule 56(f) motion for additional discovery and dismissed the case.

II.

By statute, antitrust claimants have four years from the date an action accrues to bring a lawsuit. *See* 15 U.S.C. § 15b; *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338 (1971). Accrual occurs "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp.*, 401 U.S. at 338. No one disputes the source of the injury in this case (the stadium lease); no one disputes when the injury occurred (when the parties signed the lease in May 1997); and no one disputes that the County filed the lawsuit more than four years after May 1997 (it filed the lawsuit in May 2003). What the parties dispute is whether the limitations period should be extended because, according to the County, the Bengals fraudulently concealed information material to its antitrust claims during and after the lease negotiations.

To toll a limitations period on this basis, a plaintiff must show "(1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975); *see also Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1465 (6th Cir. 1988). The County cannot satisfy this test because it knew the "operative facts that are the basis of [its] cause of action within the limitations period." *Dayco*, 523 F.2d at 394. Before, during and immediately after the negotiations over the May 1997 stadium lease, the County well understood the material facts underlying its antitrust claim: evidence of the NFL's potential monopoly power and its use of that power to "extort" (in the words of the County) one-sided stadium leases from host cities.

*First*, these same allegations were the subject of a highly publicized and ultimately unsuccessful antitrust lawsuit filed by the St. Louis Convention and Visitors Commission against the Rams *two years before* the execution of this lease. *See St. Louis Convention & Visitors Comm'n*

*v. Nat'l Football League*, 154 F.3d 851, 856, 864–65 (8th Cir. 1998) (affirming district court's grant of judgment as a matter of law for the NFL on a lawsuit brought on December 18, 1995). County officials knew about this litigation. *See, e.g.*, JA 691–92 (County negotiator Peter Bynoe acknowledging he was aware of the Rams litigation); JA 830–31 (County financial advisor and negotiator Mitchell Zeits acknowledging he knew about the Rams litigation and discussed it with County officials).

*Second*, County officials recognized (and in at least one case embraced) the characterization of the NFL's stadium negotiation tactics as extortionary. *See, e.g.*, JA 970 (minutes from County Commissioners' meeting on November 15, 1995 during which Commissioner John Dowlin stated that he spoke with the mayors of Baltimore and Chicago and that both mayors used "the word extortion" in connection with NFL teams' tactics for obtaining "better deal[s]" in their host cities); JA 976 (minutes from County Commissioners' meeting on January 5, 1996 reflecting that Commissioner Dowlin called for "somebody [to] stand[] up against the extortion of ball team owners").

*Third*, before becoming a Hamilton County Commissioner, then-Cincinnati City Councilman Todd Portune co-sponsored two pertinent motions on the issue. In one, Portune (the original plaintiff in this case) urged the city to join Cleveland in a lawsuit geared toward stopping the Browns from leaving Cleveland. *See* JA 1372 (motion stating that "[c]ities are being 'held up' by the professional leagues and team owners acting in a conspiracy to exploit the taxpayers of . . . Cincinnati and other member cities"). In the other, Portune urged the Cincinnati City Council to "take national leadership in forming a league of cities and counties to provide unity in defending against the professional sports team blackmailers who threaten moving their teams unless they're paid ransom in the form of billions of taxpayer funds for stadia." JA 1374. Portune discussed the motions publicly and told County officials about them. *See* JA 788–89 (deposition of Portune during which he was asked if he discussed the motions "publicly," to which he replied, "I'm sure we did"). Another city councilman asked the city solicitor to provide a report declaring that the "NFL is a cartel[,] . . . [a] rival league cannot obtain franchises[,] . . . [and] [a]s a result of the monopoly owners can extract enormous subsidies from taxpayers. Some call it extortion." JA 1114.

*Fourth*, County officials knew that Congress had been contemplating legislation addressing antitrust issues in professional sports. *See* JA 690–91 (Bynoe testifying he "was aware" that Congress was conducting hearings on "franchise relocation issues in professional sports" and that he was aware that "some of [the proposed] legislation focused on antitrust related issues"); JA 1011 (letter to County Commissioner Bob Bedinghaus and County Administrator David Krings accompanying a copy of a Congressional Research Service report entitled "Tax-Exempt Bonds and the Economics of Professional Sports Stadiums"); JA 1013 (Commissioner Bedinghaus' letter in response, deeming the report "very informative" and stating he "will keep it in mind as [the County] move[s] forward with [stadium] financing").

*Fifth*, newspapers across the nation carried articles reporting on and editorials decrying the NFL's monopolistic behavior. *See, e.g.*, JA 1120–21 (*Baltimore Sun* article dated October 24, 1993); JA 1118 (*USA Today* article dated October 25, 1993); JA 1115 (*Cleveland Plain Dealer* editorial entitled "Break NFL's stranglehold," which was dated November 20, 1995, and which sparked the Cincinnati city councilman to seek the report from the city solicitor declaring the NFL a cartel). Then-councilman Portune maintained a file of such articles and other documents, which he introduced into the official city council record. JA 794 (Portune testifying in deposition that he "took it upon [himself] to introduce things that were relevant so that there was a record of the materials that had been received").

All of this shows that the County in May 1997 had ample information to file a complaint that the NFL had a corner on the professional football market and used the cartel to "extort" one-sided stadium leases. And all of this suggests that the County knew the material facts underlying its antitrust claims long before the four-year limitations period had run, precluding it from relying on the fraudulent-concealment doctrine to save this lawsuit.

The County to its credit does not disclaim knowledge of these facts. It instead denies that these are the operative facts—or at least all of the operative facts—of its claim. What remained unknown was "financial information" about the Bengals' profitability, which the defendants refused to disclose during the lease negotiations. Br. at 53. As the County sees it, the Bengals painted a misleadingly bleak picture of their financial health, leading the County to believe that the team was suffering serious financial woes and could not survive without a new stadium; as it turns out, the Bengals ranked in the top half of the NFL in profitability and thus did not need a new stadium (with a favorable lease) at all. Br. at 47. The County maintains that it did not learn about the Bengals' profitability until May 2001—when the *Los Angeles Times* released information about the finances of all of the NFL teams. Without this information, it submits, it could not allege a cognizable antitrust injury and, without the existence of an antitrust injury, the claim would fail at the pleading stage.

Even if we could conceive of causes of action in which profitability might be an essential piece of information necessary to plead antitrust injury, this antitrust claim is not one of them. To plead antitrust injury, the claimant must allege that it was injured and that the injury was attributable to "anti-competitive" conduct by the defendant. *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990); *see Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The essence of the County's contention, as the complaint attests, is that the NFL possesses "monopoly power in the professional football market," and that it engages in "anticompetitive conduct" by "unlawfully leverag[ing] and abus[ing] that monopoly power to foreclose competition and gain a competitive advantage in the NFL stadia market," causing "tangible harm to competition." Second Amended Complaint ¶ 42. With or without information about the Bengals' profitability, the County could satisfy both requirements. The County could fairly allege that it was injured the minute it signed a lease on unfavorable terms. And it could fairly allege that the injury stemmed from anti-competitive conduct based on its belief (and well-known allegations made by other cities) as of May 1997 that the NFL operated as a monopoly and used its cartel power to extort favorable leases for its teams.

Whether the Bengals as one team among 32 NFL teams make money or lose money does not alter the cognizability of the claim. So long as the County received less income under the stadium lease than a free market suggests it should have received and so long as the loss stemmed from monopolistic practices by the defendants, it may allege injury. That a team ranks in the bottom half or top half of the league economically is no more relevant to the existence of that injury than another variable that may affect profitability—the team's won-loss record. If the County were right, it would mean that an antitrust violator (here, allegedly the NFL) would be liable for only some, but not all, of the direct damage caused by its conduct. That is not the way most antitrust claims work.

The antitrust problem here, to the extent there is an antitrust problem (we need not decide), is the NFL's hold on how many teams it will permit to exist and how many cities it thus may accommodate. The County, like all local governments competing to attract professional sports teams, understood this reality long before it entered into the May 1997 lease and understood the leveraging truth that goes with it: The only thing worse than having a losing team is having no team—no team for the community and its political leaders to support and no reason to say "there's always next year."

Even if we treated the Bengals' profitability as a piece of information that the County needed to know before bringing this antitrust claim, the County's theory still fails because it understood the essentials of this information when it signed the lease or at least had sufficient information to be on notice of the team's profitability. Members of the County's negotiating team testified that they were aware of the Bengals' profitability. *See, e.g.*, JA 697 (Bynoe admitting that during the lease negotiations period it "was [his] understanding . . . that [the Bengals] were making money"); JA 815–16 (Zeits admitting to not "being surprised" by the profitability figures for the NFL teams listed in the *Los Angeles Times* article and admitting that the information was not "inconsistent with any of the assumptions that [he] had about the profitability of the Bengals during the 1990s"); JA 719, 723 (County Commissioner Dowlin stating that he understood "the Bengals were making all kinds of money" at the time the parties executed the lease and that the team did not require a new stadium to be "viable and competitive"). While the County seeks to dismiss Dowlin's comments as stemming from "social chit chat," Br. at 50, Dowlin "quoted" the publication in which he read this information and acknowledged being aware of the financial data published in *Financial World* magazine—data that included estimates of NFL teams' profits and losses and that showed the Bengals' profitability.

In addition to *Financial World*'s articles featuring annual financial estimates, hometown newspapers gave estimates about how much money the Bengals were making. *See, e.g.*, JA 879 (November 1993 *Cincinnati Post* article reporting that "[b]y some estimates, the [Bengals] make[] at least $22 million every year. Profit."); JA 884 (November 1993 *Cincinnati Enquirer* article reporting that "[t]he Bengals remain profitable, despite their" losing record); JA 881 (June 1995 article in *Cincinnati Enquirer* reporting that Bengals "believed to make between $6–8 million" in profits). County officials admitted they read hometown newspapers to keep up with NFL stadium developments. *See* JA 778 (Hamilton County Commissioner Tom Neyer acknowledging he followed "stadium issues in the newspaper" and read articles in the *Cincinnati Enquirer* and *Cincinnati Post*); JA 762–63 (County Administrator and negotiator Krings testifying that "the local newspaper did some estimates" on NFL team profits, costs and revenues). And County negotiators admitted to reviewing *Financial World*'s annual estimates. *See* 811–15 (Zeits indicating that he "read . . . and looked at" *Financial World* and that he would provide copies of articles on NFL financial estimates for County officials who asked); JA 685 (Bynoe indicating that he "think[s]" he read *Financial World* and noting that the publication was "probably the first one[] to do things evaluating franchises"); JA 949–51 (fax from Zeits to Krings containing data from *Financial World*'s annual valuations of professional sports teams).

Whether these articles were accurate or not, they at least put the County on notice that the Bengals might well be quite profitable and that it ought to conduct further investigation before agreeing to the lease terms. *See Dayco*, 523 F.2d at 394 ("Any fact that should excite . . . suspicion is the same as actual knowledge of [the] entire claim."). Faced on the one hand with newspaper accounts and magazine articles reporting that the Bengals were a profitable franchise and on the other with the defendants' refusal to release the Bengals' financial statements, the County did not walk away from the negotiating table. Nor did it suspend negotiations to try to track down the Bengals' financial information elsewhere. With red flags flying, the County instead moved forward with negotiations and signed the stadium lease. *See, e.g.*, JA 689 (exchange during Bynoe deposition: "Q[:] So you didn't insist on additional revenue information, additional cost information? A[:] We asked if we could look at their books, and they said no. Q[:] And that was the end of it? A[:] Right. And we asked the client if they still wanted to continue the negotiations not having gotten that information, and they said yes. Q[:] Did the client ever tell you to go back and insist on getting that information? A[:] No."). If the County and its experienced negotiating team considered profitability to be a critical factor in the lease negotiations, their actions certainly do not reflect it; nor do their actions demonstrate the due diligence required for application of the fraudulent-concealment doctrine. *See Dayco*, 523 F.2d at 394 (finding existing information about

potential antitrust violations "should have aroused [plaintiff's] suspicions, and its failure to investigate further at that time was not the exercise of due diligence required in order to employ the fraudulent concealment doctrine to avoid the bar of the statute of limitations").

In addition to failing to exercise the requisite due diligence, the County also failed to show that the Bengals engaged in affirmative acts of concealment—another prerequisite for equitable tolling. *See Bridgeport Music, Inc. v. Diamond Times, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) (noting that fraudulent concealment requires a showing that the defendants took "active steps," such as fraudulent statements or misrepresentations, or "hiding evidence or promising not to plead the statute of limitations"); *Hentosh v. Herman M. Finch Univ. of Health Scis.*, 167 F.3d 1170, 1174 (7th Cir. 1999) (describing the doctrine as requiring "efforts by the defendant—above and beyond the wrongdoing upon which the plaintiff's claim is founded—to prevent the plaintiff from suing in time") (internal quotation marks omitted), *cited in Bridgeport*, 371 F.3d at 891. The County has failed to identify any evidence of "above and beyond" affirmative, fraudulent acts by the Bengals that prevented the County from discovering the antitrust injury.

The County offers a related fraudulent-concealment theory for tolling the limitations period—that the NFL falsely told it that the league included stadium revenues in calculating the players' salary cap, a fact supporting the Bengals' lease-negotiation stance that it needed a new stadium so that it could compete for free agents against large-market teams with higher stadium revenues. For the same reasons that profitability is not a necessary precondition to pleading an antitrust injury, neither is stadium revenue. At any rate, the uncontradicted evidence from the affidavit of Michael Keenan, the NFL's Senior Director of Labor Finance, shows that no one was misled—stadium revenues "*are* included" in calculating the salary cap. JA 2721.

The County persists that not all of its antitrust claims are time-barred; it asks us to preserve its allegations of antitrust injury stemming from an amendment to the stadium lease executed in 2000. Although the County mentioned the amendment in its complaint, *see* Second Amended Complaint ¶¶ 50–54, it did not address the 2000 amendment below in its numerous filings in response to the defendants' arguments that *all* of the County's claims were time-barred, *see* JA 1774–88 (County's motion for summary judgment on statute of limitations asking district court to dismiss defendants' affirmative defense based on expiration of statutory period for filing); JA 2362–69 (County's response to defendants' motion for summary judgment based on the statute of limitations); JA 2760–68 (County's reply to defendants' memorandum in opposition to County's summary-judgment motion on statute-of-limitations grounds). The County had more than ample opportunity to bring the amendment claim to the attention of the district court. But it did not, waiving the argument. *See J.C. Wyckoff & Assocs., Inc. v. Standard Fire Ins. Co.*, 936 F.2d 1474, 1488 (6th Cir. 1991).

### III.

The County independently urges us to reverse the district court's denial of its Civil Rule 56(f) motion for additional discovery, a decision we review for abuse of discretion. *Lewis v. ACB Business Servs., Inc.*, 135 F.3d 389, 409 (6th Cir. 1998). During discovery in this case, as opposed to during the negotiations over the May 1997 lease, the County sought to obtain from the defendants "financial data for each team, reports comparing the teams' financial data, and documents" pertaining to the salary cap. Br. at 29–30. The defendants never produced the information, and the County's Rule 56(f) motion sought to obtain it before the district court ruled on the defendants' summary judgment motion. Even if we assume for the sake of argument that this information would have shown that the Bengals were a profitable team and that the salary-cap rules did not create hardships for them, that would not have affected the assessment of their fraudulent-concealment

theory for tolling the limitations period—for the reasons stated above.  Under these circumstances, the district court necessarily did not abuse its discretion in denying the motion.

IV.

For these reasons, we affirm.