RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 12a0065p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

CARRIER CORPORATION; CARRIER SA;
CARRIER ITALIA S.P.A.,
       *Plaintiffs-Appellants/Cross-Appellees,*

     *v.*

OUTOKUMPU OYJ; OUTOKUMPU COPPER
PRODUCTS OY; OUTOKUMPU COPPER
FRANKLIN, INC.; OUTOKUMPU COPPER
(U.S.A.), INC.,
     *Defendants-Appellees/Cross-Appellants,*

MUELLER INDUSTRIES, INC.; MUELLER
EUROPE LTD; EUROPA METALLI SPA;
TREFIMETAUX SA,
                    *Defendants.*

Nos. 07-6052/6114

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 06-02186—Bernice Bouie Donald, District Judge.

Argued: October 13, 2009

Decided and Filed: March 2, 2012

Before: MOORE and COOK, Circuit Judges; LUDINGTON, District Judge.[*]

_____

## COUNSEL

**ARGUED:** David M. Schnorrenberg, CROWELL & MORING LLP, Washington, D.C., for Appellants. William H. Rooney, WILLKIE FARR & GALLAGHER LLP, New York, New York, Eric Mahr, WILMER HALE, Washington, D.C., for Appellees. **ON BRIEF:** David M. Schnorrenberg, CROWELL & MORING LLP, Washington, D.C., for Appellants. William H. Rooney, WILLKIE FARR & GALLAGHER LLP, New York, New York, Eric Mahr, Caroline T. Nguyen, WILMER HALE, Washington,

---

[*] The Honorable Thomas L. Ludington, United States District Judge for the Eastern District of Michigan, sitting by designation.

D.C., Robert L. Crawford, WYATT, TARRANT & COMBS, LLP, Memphis, Tennessee, for Appellees.

————————————

**OPINION**

————————————

KAREN NELSON MOORE, Circuit Judge.   Plaintiffs-Appellants Carrier Corporation, Carrier SA, and Carrier Italia S.p.A. (collectively "Carrier") appeal the district court's dismissal of their claims under the Sherman Act and the Tennessee Trade Practices Act for lack of subject-matter jurisdiction and for failure to state a claim. Defendants-Appellees Outokumpu Oyj ("OTO"), Outokumpu Copper Products Oy ("OCP"), Outokumpu Copper (U.S.A.), Inc. ("Outokumpu U.S.A."), and Outokumpu Copper Franklin, Inc. ("Outokumpu Franklin") (collectively "Outokumpu"), and Mueller Industries, Inc. and Mueller Europe LTD cross-appealed, arguing that the district court's ruling can be affirmed on the alternative bases that Carrier's complaint is time-barred and that the district court lacked personal jurisdiction over Mueller Europe, OTO, and OCP.   Carrier has since settled its claims with the two Mueller entities, and those defendants have been dismissed from this appeal.   As to the remaining parties, we conclude that the district court had subject-matter jurisdiction over the present dispute and that Carrier's complaint is not time-barred.   We further conclude that Carrier's complaint adequately states a Sherman Act claim against all of the Outokumpu Defendants and that the district court had personal jurisdiction over OTO and OCP individually.   We therefore **REVERSE** district court's judgment as to all Outokumpu Defendants and **REMAND** for proceedings consistent with this opinion.

## I.  BACKGROUND

### A.  The Copper Tubing Market

Copper tubing normally is "divided into two main product groups."   Joint Appendix ("J.A.") at 0036 (Am. Compl. ¶ 41).   First, there are "plumbing tubes . . . which are used for water, oil, gas, and heating installations."   *Id.*   Second, there are

"higher value-added industrial tubes." *Id.* The latter category is divided into several subgroups, the "most significant [of which] in terms of volume is tubing for air-conditioning and refrigeration ("ACR") applications." *Id.* The present litigation concerns the market for ACR copper tubing.

Plaintiff Carrier Corporation is a Delaware corporation and Plaintiffs Carrier France SA and Carrier Italia S.p.A. are both subsidiaries of Carrier. Carrier, along with its affiliates, is "the world's largest manufacturer of air-conditioning and commercial refrigeration equipment" and consequently, one of the world's largest purchasers of ACR copper tubing. *Id.* ¶ 1. According to Carrier's complaint, Defendant OTO and its wholly owned subsidiary OCP are two Finnish companies that, during the relevant time period, produced or sold ACR copper tubing and, either directly or through their subsidiaries, imported it into the United States to sell to U.S. customers. *Id.* ¶¶ 22, 26. Carrier's complaint further states that Defendants Outokumpu U.S.A. and Outokumpu Franklin, both American subsidiaries of OCP, were "engaged in the production or sale of ACR Copper Tubing in the United States." *Id.* ¶ 23–24. And Outokumpu Franklin in particular allegedly sold "substantial quantities of ACR Copper Tubing to Carrier in the United States." *Id.* ¶ 24. The complaint further alleges that OTO "had effective control over the commercial policy and business decisions of its subsidiaries, and did business through its subsidiaries." *Id.* ¶ 25.[1]

## B. The European Commission's 2003 and 2004 Decisions

Much of this lawsuit revolves around two decisions issued by the Commission of the European Communities ("EC"). The first came in December 2003, when the EC found that OTO and OCP, along with several other companies, participated in a conspiracy in which they "agreed on price targets and other commercial terms for industrial tubes, coordinated price increases, [and] allocated customers and market

---

[1] As this case was pending, Carrier reached a settlement agreement with both of the Mueller entities. Thus, in accordance with Sixth Circuit Rule 33(b) and Federal Rule of Appellate Procedure 42(b), Mueller Industries, Inc. and Mueller Europe LTD have been dismissed from this appeal. *Carrier Corp. v. Outokumpu Oyj*, Nos. 07-6052, 07-6114 (6th Cir. Nov. 15, 2011) (unpublished orders). Cases Nos. 07-6115 and 07-6116 have also been dismissed. (6th Cir. Nov. 10, 2011) (unpublished order).

shares" in violation of European law. J.A. at 0283 (EC ACR Decision ¶ 2). The EC determined that this conspiracy lasted from at least May 3, 1988 to March 22, 2001. The EC's findings, however, do not identify any conspiratorial agreements with respect to U.S. markets.

In September 2004, a separate EC decision found a similar violation of European law in the market for plumbing tubes. The EC again found OTO and OCP liable, this time along with with Mueller Industries and Mueller Europe. J.A. at 0072 (EC Plumbing Decision ¶¶ 1–2). The EC decision emphasized, however, that "the arrangements pertaining to plumbing tubes on the one hand and those relating to industrial tubes on the other hand involved different companies (and employees), and were organised in a different way." *Id.* ¶ 5. Once again, the decision did not address any whether any conspiracy extended beyond the European markets.

## C. The Present Litigation

In its amended complaint, Carrier essentially alleges that the European conspiracy uncovered by the EC was also directed at the U.S. market for ACR industrial tubes, thereby violating the Sherman Act and the Tennessee Trade Practices Act. Carrier is not the first plaintiff to make this allegation—the district judge in this case has also dismissed two similar cases involving essentially the same defendants. *See Am. Copper & Brass, Inc. v. Boliden AB*, No. 04-2771 DV (W.D. Tenn. Oct. 10, 2006) (unpublished opinion); *In re ACR Copper Tubing Litig.*, No. 06-2207 (W.D. Tenn. July 26, 2007) (unpublished opinion).

Carrier specifically alleges that between 1988 and 2001, the Defendants conspired to raise the price for ACR tubing by developing "a customer and market allocation scheme" under which "Carrier's business in the United States was allocated to the Outokumpu defendants." J.A. at 21 (Am. Compl. ¶ 4). The other conspirators, including Wieland-Werke AG ("Wieland") and KM Europa Metal AG ("KME"), "agreed not to pursue" Carrier's U.S. business. *Id.* In return, Wieland and KME received Carrier's European business and the Outokumpu Defendants agreed not to aggressively pursue it. As a result of these agreements, Carrier maintains that it "paid

artificially inflated and supra-competitive prices for ACR Copper Tubing in the United States, Europe and elsewhere." *Id.* ¶ 2.[2] Outokumpu, Wieland, and KME were able to do this, Carrier alleges, because "they were the three largest producers of ACR Copper Tubing in the world," which resulted in "circumstances [that] facilitated the conspiracy." *Id.* ¶ 5. Carrier also explains that Outokumpu, Wieland, and KME were eager to preempt alternative suppliers that could undercut their prices. To that end, "[t]hey enlisted the support of others in the conspiracy," including Mueller Industries and Mueller Europe. *Id.* ¶ 6. The Mueller entities agreed not to pursue Carrier's business in the ACR tubing market, and in return, the other conspirators allocated different markets to Mueller.

Carrier substantiates these claims in part by drawing from details found in the EC industrial-tubes decision. For instance, like the EC decision, the complaint alleges that Outokumpu and the other co-conspirators coordinated their conspiracy through the biannual meetings of the trade association known as the Cuproclima Quality Association. In doing so, the complaint quotes various incriminating documents uncovered by the EC investigation, details the time and place of specific meetings, and also describes specific price targets set by the alleged conspirators.

Carrier's complaint also includes allegations that were not drawn from the EC decisions. Carrier argues that these allegations provide circumstantial evidence that the market-allocation scheme reached beyond the European markets and into the United States. Indeed, Carrier maintains that the market for ACR copper tubing was global in scope and, as further evidence of such an arrangement, points to an Outokumpu document uncovered in the EC investigation that references a "Global Agreement" between the co-conspirators. Along these lines, Carrier also reasons that any successful conspiracy must have involved the United States so as to prevent a multinational corporation like Carrier from "purchas[ing] all of the corporation's world-wide demand for ACR Copper Tubing in the United States and then ship[ping] those products to

---

[2]On appeal, Carrier has limited its claims to purchases made within the United States. Carrier Br. 1 at 23 n.2.

facilities world-wide." *Id.* ¶ 59. Thus, Carrier maintains that "Defendants and their co-conspirators singled out Carrier and other similarly situated companies by devising a unique global approach for fixing the prices of ACR Copper Tubing offered to Carrier." *Id.* ¶ 61. In support of this global conspiracy, Carrier further contends that Outokumpu scheduled yearly contract negotiations with U.S. customers that occurred after the fall Cuproclima meetings and during which the target prices and market allocations were set. Carrier also alleges that prices in the U.S. remained similar to those in other regions, which facilitated consistent pricing levels across the relevant markets. Likewise, Carrier claims that during the period between 1988 and 2001, none of Outokumpu's co-conspirators aggressively pursued business in one another's markets. But around 2003, after the cartel disbanded, Wieland and KME suddenly began soliciting Carrier's U.S. business.

In December 2006, Outokumpu moved to dismiss the amended complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), and 12(b)(6). The district court granted the motions on the basis that it lacked subject-matter jurisdiction over Carrier's Sherman Act claims. The district court justified the dismissal by observing that the complaint merely "'cut-and-pasted,'" J.A. at 926 (July 27, 2006 Dist. Ct. Order at 6), facts from the EC decisions in a manner that rendered it "'wholly insubstantial.'" *Id.* at 928. The district court was also troubled by the complaint's use of "facts from the plumbing tubing and ACR tubing investigations as if they described a single conspiracy," which the district court concluded "undermined any credibility the complaint otherwise possessed." *Id.* at 927. According to the district court, the plaintiffs did "further injury to their argument" by drawing facts from the EC's decisions when they supported Carrier's claims while disregarding contradictory information, such as the fact that "the EC findings were limited to European conduct." *Id.* Apparently for the same reasons that it lacked subject-matter jurisdiction, the district court also concluded that the case "lack[ed] a legitimate factual foundation" and therefore warranted dismissal under Federal Rule of Civil Procedure 12(b)(6). *Id.* at 931. Carrier appealed, and the Defendants cross-appealed, raising additional grounds on which to uphold the district court's judgment.

## II.  ANALYSIS

### A.  Jurisdictional Prerequisites

Outokumpu first argues that the district court correctly found subject-matter jurisdiction lacking because Carrier's complaint was "wholly insubstantial."  *See* Outokumpu Br. at 26.  Although the district court's reasoning was premised on its determination that the complaint had no substance of its own, Outokumpu's argument extends that focus and also maintains that Carrier fails to allege any substantial U.S.-market involvement, a required element for extraterritorial jurisdiction under the Sherman Act.[3]  We conclude that under either theory, Carrier's allegations were sufficient to demonstrate the court's jurisdiction for purposes of a motion to dismiss.

#### 1.  Jurisdiction Under the Sherman Act

Since Judge Learned Hand's leading opinion in *United States v. Aluminum Co. of America (Alcoa)*, 148 F.2d 416, 443 (2d Cir. 1945), which proposed the need for practical limitations on the Sherman Act that would avoid global overreaching, it has been generally established that the so-called "effects test" limits the Sherman Act "to those acts (1) that 'significantly' or 'directly' affect United States commerce, or (2) that are intended to have an effect, or (3) that are both intended to have and do have such an effect."  IB Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272d, at 279–80 (3d

---

[3]Outokumpu also argues that the district court lacked subject-matter jurisdiction because the alleged conspiracy did not have a "direct, substantial, and reasonably foreseeable effect" on United States commerce as is required under the Foreign Trade Antitrust Improvements Act of 1992 ("FTAIA"). 15 U.S.C. § 6a.  The FTAIA, however, specifically exempts from its reach "import commerce" with foreign entities. *Id.*  According to *F. Hoffmann-LaRoche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004), the FTAIA "initially lays down a general rule placing *all* (non-import) activity involving foreign commerce outside the Sherman Act's reach" and then selectively brings some categories of that excluded conduct back within the Sherman Act's strictures.  *See also* IB Phillip Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 272i4, at 307–08 (3d ed. 2006).  Areeda and Hovenkamp, in turn, have indicated that "[f]oreign import commerce involves transactions in which the seller is located abroad while the buyer is domestic and the goods flow into the United States." *Id.* at 290.

Carrier's claim here is limited to its domestic purchases, and thus, does not involve the type of foreign commerce that would be implicated by the FTAIA.  As a result, even if the FTAIA does present a jurisdictional limitation—a question that we do not decide here—it does not apply to this case. *Cf. Dee-K Enters., Inc. v. Heveafil Sdn. Bhd.*, 299 F.3d 281, 287 (4th Cir. 2002) (concluding, in a case involving mainly foreign producers selling rubber thread in the United States and elsewhere, that the FTAIA did not apply "[b]ecause this case involves importation of foreign-made goods, . . . conduct Congress *expressly exempted* from FTAIA coverage as 'involving . . . import trade or import commerce . . . with foreign nations'" (third and fourth alterations in original)), *cert. denied*, 539 U.S. 969 (2003).

ed. 2006) (citing *Alcoa*, 148 F.2d at 443–44).  These standards have since been widely incorporated into U.S. jurisprudence.  Indeed, "it is well established by now that the Sherman Act applies to foreign conduct that was meant to produce and did in fact produce some substantial effect in the United States."  *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796 (1993).  The Supreme Court, however, has not delineated the precise bounds of the effects test, and lower courts are not in agreement as to its exact scope.  *Cf. generally Dee-K Enters., Inc. v. Heveafil Sdn. Bhd.*, 299 F.3d 281, 286 (4th Cir. 2002) (addressing the scope of the effects test and discussing the complexities inherent in applying the test in cases such as this one, which involve a "mixture of foreign and domestic elements").  Nonetheless, we need not undertake that task at present because, regardless of the precise standard, Carrier has sufficiently alleged any threshold effect on U.S. commerce necessary to survive a motion to dismiss.

*Hartford Fire* involved Sherman Act claims by U.S. states and private domestic insurers alleging that a group of mainly foreign reinsurers conspired to limit coverage of certain casualty risks in a manner that would effectively prevent the domestic insurers from offering coverage for those risks in certain state markets.  509 U.S. at 795.  Without laying out its reasoning, the Court accepted the reinsurers' concession that jurisdiction existed under the Sherman Act, even though the claims plainly involved "foreign conduct."  *Id.* at 796–97.[4]  The alleged impact on U.S. markets in this case is equally,

---

[4] We note that there is some confusion whether the Sherman Act's requirements in fact speak to subject-matter jurisdiction.  The genesis of this confusion arises from the Supreme Court's description of the extraterritorial scope of the Sherman Act in *Hartford Fire Ins. Co. v. California*, 509 U.S. 794, 796 n.22 (1993), as relating to "jurisdiction."  At the time, Justice Scalia's dissent disputed that characterization and sought to clarify that the term did not refer to the court's subject-matter jurisdiction and instead referenced the prerequisites for stating a claim on the merits. *See id.* at 813 (Scalia, J. dissenting); *cf.* Restatement (Third) of Foreign Relations Law § 401 cmt. c (1987) (indicating that the term "subject matter jurisdiction" may be used both in the context of Congress's power to prescribe legislation and in the context of a court's "jurisdiction to adjudicate").  Although *Hartford* did not squarely address the issue, many lower courts nonetheless continue to treat the Sherman Act's extraterritorial limitations as jurisdictional rather than as elements of a federal antitrust claim. *See, e.g.*, *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.*, 417 F.3d 1267, 1268–69 (D.C. Cir. 2005), *cert. denied*, 546 U.S. 1092 (2006); *United States v. LSL Biotechnologies*, 379 F.3d 672, 677–79 (9th Cir. 2004); *United Phosphorus, Ltd. v. Angus Chem. Co.*, 322 F.3d 942, 948 (7th Cir.), *cert. denied*, 540 U.S. 1003 (2003).  Recent Supreme Court decisions, however, raise significant questions about the wisdom of that approach.

After *Hartford*, the Supreme Court has been much more wary of labeling statutory requirements as "jurisdictional."  Seeking to create a "readily administrable bright line," the Court has since set out the general rule that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 516 (2006); *see also Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1244 (2010).  Moreover, in *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869, 2877 (2010), the Court determined that questions

if not more, direct. Carrier alleges that the U.S. market was intertwined in the conspirators' allocation efforts and that the result of that agreement was to raise prices artificially for ACR copper tubing for transactions between the co-conspirators and buyers in the United States. J.A. at 0039–40 (Am. Compl. ¶¶ 51, 54). Taking those allegations as true, as we must do at this stage in the litigation, we have no hesitation in concluding that Carrier's complaint meets any threshold jurisdictional requirement imposed by the Sherman Act on claims involving foreign conduct.

### 2. Subject-Matter Jurisdiction

Because Carrier has met any required threshold for stating a claim against a foreign entity under the Sherman Act, we proceed to consider whether the complaint can survive Outokumpu's and the district court's assertion that the allegations were insufficient to survive Outokumpu's Federal Rule of Civil Procedure 12(b)(1) challenge.

Challenges to subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1) "come in two varieties: a facial attack or a factual attack." *Gentek Bldg. Prod., Inc. v. Steel Peel Litig. Trust*, 491 F.3d 320, 330 (6th Cir. 2007). Under a facial attack, all of the allegations in the complaint must be taken as true, much as with a Rule 12(b)(6) motion. *Id.* When the district court relies on a facial analysis, we review its findings de novo. *Lovely v. United States*, 570 F.3d 778, 781 (6th Cir. 2009), *cert. denied*, 130 S. Ct. 1054 (2010). Under a factual attack, however, the court can actually weigh evidence to confirm the existence of the factual predicates for subject-matter jurisdiction. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996); *see also* 2 James Wm. Moore, *Moore's Federal Practice* § 12.30[4] (3d ed. 2000) ("[W]hen a court reviews a complaint under a factual attack, the allegations have no presumptive truthfulness, and the court that must weigh the evidence has discretion

concerning the extraterritorial application of § 10(b) of the Securities Exchange Act of 1934, which has language that somewhat mirrors that in the Sherman Act, were not jurisdictional. These decisions have thus questioned the precedential value of the types of "drive-by jurisdictional rulings," *Arbaugh*, 546 U.S. at 511 (internal quotation marks omitted), seen in cases like *Hartford*. *Cf. generally* Howard M. Wasserman, Colloquy Essay, *The Demise of "Drive-By Jurisdictional Rulings*," 105 Nw. U. L. Rev. 947 (2011). Nonetheless, because the parties have not addressed this issue directly, and because our decision does not hinge on further elucidation of the meaning of "jurisdiction" in this context, we will save the resolution of this issue for another day.

to allow affidavits, documents, and even a limited evidentiary hearing to resolve disputed jurisdictional facts."). When the district court does so, we review its findings for clear error. *Lovely*, 570 F.3d at 781–82. Outokumpu has presented arguments for both a facial and factual challenge to subject-matter jurisdiction, and we address each in turn.

### a. Outokumpu's Facial Attack

In order for Carrier's complaint to allege jurisdiction adequately, it must contain non-conclusory facts which, if true, establish that the district court had jurisdiction over the dispute. *O'Bryan v. Holy See*, 556 F.3d 361, 375–76 (6th Cir.), *cert. denied*, 130 S. Ct. 361 (2009). The district court dismissed Carrier's complaint on the basis that it is "wholly insubstantial." J.A. at 0930 (Dist. Ct. Op. at 10). We, however, disagree that this case presents one of the rare instances that permit a district court to dismiss a complaint because "the plaintiff's claims are clearly immaterial, made solely for the purpose of obtaining jurisdiction or are wholly unsubstantiated and frivolous." *Gentek*, 491 F.3d at 332 (internal quotation marks omitted).

Carrier's complaint describes, in some detail, an elaborate worldwide conspiracy in which the U.S. market for ACR copper tubing was assigned to Outokumpu. Furthermore, Carrier alleges that this conspiracy caused the price of goods purchased within the United States to increase, which in turn caused a direct antitrust injury. In support of these allegations, the complaint references numerous specific dates during which the Cuproclima cartel met and the various agreements its members entered into. Assuming that these allegations are true, as we must, we conclude that Carrier has met any applicable requirement that it allege a non-conclusory effect on U.S. commerce. *Cf. Hartford*, 509 U.S. at 795–97 (finding jurisdictional requirements easily satisfied when complaint alleged that "London reinsurers . . . conspired to coerce primary insurers in the United States to offer" certain forms of coverage—a claim that alleged both an impact on the U.S. insurance market and that the reinsurers' "conduct in fact produced substantial effect").

Outokumpu, which attached the full EC decision to its motion to dismiss, counters that many of the details contained in the complaint are drawn from the EC

industrial-tube decision that found no evidence that the cartel's focus extended beyond Europe. Like the district court, Outokumpu argues that Carrier's complaint includes misleading quotes from the EC decision and omits language explaining that the conspiracy applied only to European markets. As a consequence, Outokumpu argues that any details regarding specific meetings and agreements occurring during the Cuproclima meetings are of no assistance to Carrier because they relate only to a European conspiracy. Furthermore, when those portions of the complaint are excluded, as Outokumpu insists they must be, Carrier is left with nothing more than conclusory allegations.

We are unpersuaded by this argument. Initially, Outokumpu overstates the degree to which Carrier's complaint conflicts with the EC decision. For instance, as Carrier points out, the EC industrial-tubes decision clearly states that "[i]nsofar as the activities of the cartel relate[] to sales in countries that are not members of the Community . . . they lie outside the scope of this Decision." J.A. at 0332 (EC ACR Decision ¶ 229). Thus, any silence on the part of the EC decision as to U.S. markets may simply reflect the limited scope of the decision. Outokumpu responds that "even a cursory review of the EC's cartel decisions makes clear that Commission decisions addressing cartels that extend beyond Europe regularly describe the entire geographic scope of the cartel." Outokumpu Br. 2 at 47. But the mere fact that the EC does at times look beyond Europe should not trump its otherwise explicit statement that it is not concerned with outside markets.[5]

In addition, to the extent that there is a conflict between Carrier's allegations and the EC decision, we do not agree that Carrier is bound by the EC's findings. Ordinarily,"[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim." *Weiner v. Klais & Co.*, 108 F.3d 86, 89 (6th Cir. 1997) (alteration in

---

[5]The Defendants further argue that, in any event, the EC decision provides no "positive" support for a finding of a U.S. conspiracy. Outokumpu Br. 4 at 10. But Carrier need not provide any additional support for its assertions. Carrier has directly alleged that the Defendants engaged in an unlawful U.S.-focused market-allocation scheme; it need not offer any additional evidentiary support at the pleading stage.

original) (internal quotation marks omitted).  The general rule is that "[i]f inconsistent with the allegations of the complaint, the exhibit controls."  *Mengel Co. v. Nashville Paper Prod. & Specialty Workers Union, No. 513*, 221 F.2d 644, 647 (6th Cir. 1955).  We have recognized, however, that it is not always appropriate to "assume everything [in an exhibit] is true."  *Jones v. City of Cincinnati*, 521 F.3d 555, 561 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 909 (2009).  In particular, although "[a] blanket adoption rule makes sense in the context of an attached contract or loan agreement because the contract represents an agreement between two or more parties to which the law binds them," the rule makes much less sense when, as is the case here, the exhibit is not a legally dispositive document.  *N. Ind. Gun & Outdoor Shows, Inc. v. City of South Bend*, 163 F.3d 449, 455 (7th Cir. 1998).  When an exhibit is a contract, it is reasonable to consider the entire document because the contract has independent legal significance.  Here, however, Outokumpu is citing the EC's findings not merely to prove their existence but rather to prove the truth of the matters asserted within them.  *See Jones*, 521 F.3d at 561 (finding that transcripts of an interview attached to the plaintiff's complaint could be considered as an allegation that those statements were made, but the truth of those statements could not be considered on a motion to dismiss).  To permit such a tactic would allow Outokumpu impermissibly to question the evidentiary foundation of Carrier's complaint, thereby depriving Carrier of the presumption of truth to which it is entitled at this stage of litigation.  Indeed, Carrier should be free to draw facts from the EC decision to provide a "starting point" and then use those facts to construct a theory that differs from or even contradicts that of the EC.  Carrier Br. 3 at 10 (emphasis omitted).[6]

Furthermore, Carrier offers additional circumstantial allegations that corroborate its claim that the market-allocation scheme extended to the United States.  Although

---

[6]The Defendants maintain that the district court was permitted to take judicial notice of the EC decisions.  They also argue that judicial notice is a permissible basis for considering a letter submitted by EC Director Kirtikumar Mehta, which reiterated that the scope of the EC industrial-tubes decision was "limited to the European territory."  J.A. at 0919 (Mehta Letter at 1).  But here again, judicial notice would be appropriate only to prove the fact that the decisions and the letter existed, not the truth of the matters stated therein.  *Scotty's Contracting & Stone, Inc. v. United States*, 326 F.3d 785, 790 n.1 (6th Cir. 2003) ("[J]udicial notice of a fact is generally only appropriate when there is no dispute regarding the fact.").

Carrier's complaint provides numerous circumstantial allegations, of particular interest is its claim that Wieland and KME initially refrained from aggressively competing for Carrier's U.S. business until 2003, and then suddenly began doing so at that time. It is true that the mere fact that competitors do not intrude upon one another's markets does not necessarily mean that an illegal market-allocation scheme is taking place. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 567–78 (2007). When two companies refrain from entering a market and then suddenly do so after a cartel dissolves, however, there are good grounds for suspicion. Defendants question why it is that KME and Wieland waited until two years after the Cuproclima conspiracy dissolved to enter the United States if all that was stopping them was a supposed allocation conspiracy. It is certainly plausible, however, that these two companies would require time to reconfigure their operations so as to enable themselves to enter a new market. Similarly, 2003 is the year in which the EC's industrial-tubes investigation came to a close, and it is plausible for KME and Wieland to wait until that moment before engaging in what could be viewed as suspicious activity.

This analysis demonstrates that, contrary to Outokumpu's argument—and the district court's conclusion—Carrier's complaint does not fall within the rare exception created by *Bell v. Hood*, 327 U.S. 678, 682–83 (1946), which permits district courts to dismiss complaints that are "wholly insubstantial and frivolous." *See also Musson Theatrical, Inc. v. Fed. Express Corp.*, 89 F.3d 1244, 1248 & n.1 (6th Cir. 1996) (stating that "[w]hen a 12(b)(1) motion attacks the face of a complaint . . . [t]he plaintiff must show only that the complaint alleges a claim under federal law, and that the complaint is "substantial," and defining "substantial" as "non-frivolous" ). The exception on which Outokumpu and the district court relied is quite narrow and ordinarily reserved for extremely weak claims. *See, e.g.*, *Moore v. Lafayette Life Ins. Co.*, 458 F.3d 416, 444 (6th Cir. 2006) (explaining that the rule from *Bell v. Hood*, 327 U.S. 678 (1946), should apply "only where the plaintiff's claim has no plausible foundation or is clearly foreclosed by a prior Supreme Court decision" (internal quotation marks omitted)); *Apple v. Glenn*, 183 F.3d 477, 478–79 (6th Cir. 1999), *cert. denied*, 528 U.S. 1198 (2000) (affirming dismissal due to lack of jurisdiction in a case in which the plaintiff

"sued Senator John Glenn, Chief Justice William Rehnquist, and other top government officials, claiming that the defendants violated his First Amendment right to petition the government because they did not answer his many letters or take the action requested in those letters.").

The district court concluded that Carrier's complaint falls within the exception because it "cut-and-pasted" many sections of the EC decisions. As explained above, however, the mere fact that the complaint borrows its substance from the EC decision and then builds on the EC's findings does not render its allegations any less valid. Furthermore, even if all of the facts taken from the EC decisions were stripped from the complaint, Carrier's complaint still offers additional allegations, such as its claims regarding KME and Wieland's sudden entry into the U.S. market. As even the district court noted, portions of Carrier's complaint "create[d] a close approximation of [the] factual predicate" needed to establish its claim. J.A. at 927 (Dist. Ct. Order at 7). Under such circumstances, Carrier's complaint comes nowhere near the level of frivolity required by the "wholly insubstantial and frivolous" exception, and the district court erred in dismissing the case on that basis.

### b. Outokumpu's Factual Attack

Outokumpu further argues that, even if Carrier's complaint facially appears to plead a U.S.-focused conspiracy, to the extent that the district court made factual findings in applying the "wholly insubstantial" standard and making its determination that the allegations lacked the requisite "U.S. nexus," we should review that analysis using the standards for a factual attack. Outokumpu Br. 2 at 55 n.17.

We first note that it is unclear whether the district court here made any findings of fact. Indeed, the court never explicitly stated that it was doing so. The court did, however, assess the complaint's "credibility," J.A. at 927 (Dist. Ct. Op. at 7), and referenced its own power to "mak[e] reasonable inquiry into the facts," *id.* at 929 (Op. at 9). Therefore, we assume that the district court found, as a matter of fact, that the conspiracy alleged in Carrier's complaint did not target U.S. markets.

"[A] district court engages in a factual inquiry regarding the complaint's allegations only when the facts necessary to sustain jurisdiction do not implicate the merits of the plaintiff's claim." *Gentek*, 491 F.3d at 330. In other words, the district court is prohibited from making factual findings with respect to a jurisdictional issue when such a finding would adversely affect the merits of the plaintiff's case. *Id.* at 331. When "an attack on subject-matter jurisdiction also implicates an element of the cause of action, then the district court should *find that jurisdiction exists* and deal with the objection as a direct attack on the merits of the plaintiff's claim." *Id.* at 330 (internal quotation marks omitted).

In the context of Sherman Act claims against foreign defendants, the extent of U.S.-market impact affects more than a court's jurisdiction; it also speaks to whether there is "sufficient injury or anticompetitive effect to establish liability." Restatement (Third) of Foreign Relations Law § 415, reporter's note 3 (1987). Thus, as Areeda and Hovenkamp have observed, the "'jurisdictional' and 'substantive' inquiries are not wholly independent." IB Areeda & Hovenkamp ¶ 273, at 326. That being the case, to the extent that the district court did render a factual finding, any such finding was improper. *Cf. Hartford*, 509 U.S. at 796 n.21 (explaining that the court was "bound to credit" allegations that foreign defendants conspired to coerce American insurers, the very conduct upon which the court found the requisite "substantial effect" to be based).

In conclusion, we hold that the district court did not lack subject-matter jurisdiction over Carrier's complaint. We therefore proceed to an evaluation of the merits of Outokumpu's Federal Rule of Civil Procedure 12(b)(6) motion to dismiss for failure to state a claim.

**B.  The Outokumpu Defendants' Rule 12(b)(6) Motion**

The Defendants next argue that Carrier's complaint fails to state a claim. We review de novo a district court's decision to grant a Rule 12(b)(6) motion. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 456 (6th Cir. 2011). "We 'construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Id.*

at 456 (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 902 (6th Cir. 2009), *cert. denied*, 131 S. Ct. 896 (2011)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In *Bell Atlantic Corp. v. Twombly*, however, the Supreme Court emphasized that it is not enough merely to plead a set of facts "consistent with" a claim to relief; there must also be enough "factual enhancement" to "nudge [the] claim[] across the line from conceivable to plausible." 550 U.S. at 557, 570. To conduct this analysis, a court should first identify factual allegations that are entitled to a presumption of truth—that is, those allegations that are more than just legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1950–51 (2009). Then the court should "consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951.

Carrier's claim falls under § 1 of the Sherman Act, which prohibits conspiracies "in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. Here, the parties focus on the existence of a conspiracy impacting U.S. markets. Carrier's complaint attempts to establish a Sherman Act violation by alleging "an explicit agreement to restrain trade," and therefore must "'plausibly suggest[],' rather than be 'merely consistent with,' an agreement to restrain trade in violation of the Sherman Act." *Watson*, 648 F.3d at 457 (quoting *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 908). To survive a motion to dismiss, these allegations must be specific enough to establish the relevant "who, what, where, when, how or why." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 437 (6th Cir. 2008) (internal quotation marks omitted). Furthermore, they must "specify how [each] defendant [was] involved in the alleged conspiracy." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d at 905.

Outokumpu first reiterates its previous argument that the alleged conspiracy had no effect on the United States. That argument, however, fails for the same reasons as did Outokumpu's challenge to this court's subject-matter jurisdiction under the Sherman

Act's effects test. Furthermore, as was also detailed above, the allegations extend well beyond the conclusory "if it happened there, it could have happened here" argument that has been rejected in other courts. *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).

Outokumpu's U.S. entities—Outokumpu U.S.A. and Outokumpu Copper Franklin—then argue that there are insufficient allegations as to their specific involvement in the conspiracy. The two U.S. entities' argument stems from Carrier's frequent use of blanket references to the "Outokumpu defendants," without always specifying the role that each corporate entity played in the conspiracy. Outokumpu U.S.A. and Outokumpu Copper Franklin further note that neither EC decision mentions their involvement. In addition, the complaint does not specifically identify either company as a member of the Cuproclima conspiracy.

Even in the absence of direct allegations that Outokumpu's U.S. entities were co-conspirators at Cuproclima, however, the court may look beyond those entities' corporate forms if the complaint presents facts to support a determination that the subsidiaries were alter egos of the parent corporation. *Cf. Opdyke Inv. Co. v. City of Detroit*, 883 F.2d 1265, 1272 (6th Cir. 1989) ("It is true that the parent and subsidiary companies . . . were separately incorporated, but they must be treated as a single entity under the antitrust laws." (citing *Copperweld Corp. v. Independence Tube Corp*, 467 U.S. 752 (1984))); *Bhd. of Locomotive Engineers v. Interstate Commerce Comm'n*, 909 F.2d 909, 914 (6th Cir. 1990) (indicating that a wholly controlled subsidiary may be an "alter ego" of the parent company depending on the facts of a particular case). Thus, the question becomes whether OTO and OCP's control over the U.S. entities was sufficiently extensive to permit imputation of the conspiracy to the U.S. entities.

For purposes of the motion to dismiss, Carrier's allegations are sufficient to support such a determination. The complaint identifies that the U.S. entities are responsible for selling the overpriced tubing directly to Carrier, stating, for instance, that "[d]uring the Relevant Period, [Outokumpu Copper Franklin] sold substantial quantities of ACR Copper Tubing to Carrier in the United States." J.A. at 0028 (Am. Compl.

¶ 24). The complaint also identifies Outokumpu U.S.A. as "engaged in the production or sale of ACR Copper Tubing in the United States, Europe, and elsewhere, directly and/or through its affiliates and/or wholly-owned subsidiaries during the Relevant Period." *Id.* ¶ 23. More importantly, however, Carrier has alleged that the various Outokumpu entities were operated and deliberately portrayed to the outside world as a "single global enterprise" in which key executives overlapped between the U.S. and European entities and vital management personnel rotated through positions on both sides of the Atlantic. *Id.* ¶¶ 27–30. Under such circumstances, requiring Carrier to delineate in the complaint the role each subsidiary played in the conspiracy is unnecessary,[7] and Carrier's allegations against Outokumpu's U.S. entities are sufficient to survive the motion to dismiss.

## C. Statute of Limitations and Personal Jurisdiction

Turning to the cross-appeal, Outokumpu next argues that Carrier's complaint is time-barred and that the district court lacked personal jurisdiction over OTO and OCP. Because it decided the case on other grounds, the district court did not address either of these issues in its dismissal order.

As an initial matter, "[i]t is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Katt v. Dykhouse*, 983 F.2d 690, 695 (6th Cir. 1992) (alteration in original) (quoting *Singleton v. Wulff*, 428 U.S. 106, 120 (1976)). We make an exception, however, for cases such as this one in which "the issue[s are] presented with sufficient clarity and completeness and [their] resolution will materially advance the progress of . . . already protracted litigation." *Id.* (internal quotation marks omitted). This litigation has been ongoing since 2006, and both Outokumpu and Carrier have fully briefed the statute-of-limitations and personal-jurisdiction issues. We therefore think it appropriate to address Outokumpu's arguments.

---

[7]Outokumpu again reiterates its argument that Carrier's allegations are inconsistent with the findings in the EC decision. Specifically, Outokumpu points to statements limiting the Cuproclima cartel to European customers. As discussed above, this is unsurprising given that the scope of the EC's decision was limited to Europe and therefore did not implicate Outokumpu's U.S. entities. Thus, as stated in Section II.A.1, our review is not constrained by the EC's decision to refrain from considering the existence of agreements beyond the European markets.

## 1. Statute of Limitations

A Sherman Act claim must be brought "within four years after the cause of action accrued." 15 U.S.C. § 15b. The Amended Complaint indicates that the conspiracy ended in 2001. Carrier did not file its first complaint, however, until March 2006. Nonetheless, Carrier argues that the statute of limitations should be tolled under the doctrine of fraudulent concealment.

"Three elements must be pleaded in order to establish fraudulent concealment: (1) wrongful concealment of their actions by the defendants; (2) failure of the plaintiff to discover the operative facts that are the basis of his cause of action within the limitations period; and (3) plaintiff's due diligence until discovery of the facts." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975). A plaintiff must plead the factual allegations underlying a claim of fraudulent concealment with particularity. *Friedman v. Estate of Presser*, 929 F.2d 1151, 1160 (6th Cir. 1991). With regard to the "wrongful concealment" element the plaintiff must point to "affirmative acts of concealment." *Hamilton Cnty. Bd. of Comm'rs v. Nat'l Football League*, 491 F.3d 310, 319 (6th Cir. 2007). "[M]ere silence or unwillingness to divulge wrongful activities is not sufficient." *Browning v. Levy*, 283 F.3d 761, 770 (6th Cir. 2002). Instead, there must be some "'trick or contrivance intended to exclude suspicion and prevent inquiry.'" *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1467 (6th Cir.), *cert. denied*, 488 U.S. 880 (1988) (quoting *Wood v. Carpenter*, 101 U.S. (11 Otto) 135, 143 (1879)). Furthermore, in evaluating the due-diligence element, the court should evaluate such acts of active concealment as a factor in determining whether the plaintiff's investigation was reasonable under the circumstances. *Campbell v. Upjohn Co.*, 676 F.2d 1122, 1128 (6th Cir. 1982). Thus "[a]ctions such as would deceive a reasonably diligent plaintiff will toll the statute; but those plaintiffs who delay unreasonably in investigating circumstances that should put them on notice will be foreclosed from filing, once the statute has run." *Id.*

Here, Carrier's complaint points to numerous instances in which the conspirators[8] actively tried to hide their conduct. Some of these allegations lack any specificity, and therefore fall short of meeting the standard required to support a claim of fraudulent concealment. For instance, the complaint alleges that in 2001, after the EC began investigating Outokumpu, Outokumpu denied any wrongdoing. As stated above, however, an unwillingness to provide information is not an "affirmative act." Furthermore, the complaint alleges that the Defendants "utiliz[ed] covert meetings" and "[gave] false and pretextual reasons for the pricing of ACR Copper Tubing sold . . . during the Relevant Period and [described] such pricing falsely as being the result of competitive factors rather than collusion." J.A at 0051–52 (Am. Compl. ¶ 104(a), (c)). This also lacks the requisite particularity, as it fails to specify "the time, place, and content of the alleged" fraudulent acts. *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 505 (6th Cir. 2007) (internal quotation marks omitted).

Other portions of the complaint, however, provide specific details regarding the nature of the alleged cover-up. For example, the complaint quotes the EC's findings that the conspirators "'established security rules to prevent a paper trail . . . and used a coding-system to hide the identity of the producers in their documents and spreadsheets.'" J.A. at 0052 (Am. Compl. ¶ 105). In contrast to those discussed above, these allegations—especially when coupled with the details referenced in the cited portion of the EC decision and associated cross-references—are sufficiently particular to meet the pleading standard for fraudulent concealment. *See* J.A. at 0330 (EC ACR Dec. ¶ 218); *In re Elec. Carbon Prods. Antitrust Litig.*, 333 F. Supp. 2d 303, 316 (D.N.J. 2004) (concluding that a plaintiff "injected precision" into its fraudulent-concealment claim "by pleading the findings of the United States Department of Justice and the European Commission" (internal quotation marks omitted)). Furthermore, such conduct is sufficiently affirmative for purposes of satisfying the "wrongful concealment" element because the alleged actions involved taking active steps to hide evidence, as opposed to

---

[8] Although Carrier does not always specify whether Outokumpu engaged in the relevant concealment, this is irrelevant because "[f]raudulent concealment . . . may be established through the acts of co-conspirators." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 538 (6th Cir. 2008), *cert. denied*, 129 S. Ct. 1673 (2009).

simply meeting in secret.  *See Bridgeport Music, Inc. v. Diamond Time, Ltd.*, 371 F.3d 883, 891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative concealment).  Finally, Carrier alleges that because of the co-conspirators' misstatements and attempts at suppressing evidence of illegal conduct, it had no knowledge of the Defendants' conspiracy until the release of the EC decision on December 16, 2003.  Taken as true, these actions would have both concealed from Carrier the very "means of discovering [its] cause of action," *Campbell*, 676 F.2d at 1127, and prevented Carrier from discovering the basis for its antitrust claim within the limitations period.  Carrier has thus adequately pleaded the first two prongs of a fraudulent-concealment claim.

As for the third prong of *Dayco*—Carrier's due diligence—Carrier's complaint acknowledges that it was aware that the EC was investigating Outokumpu for antitrust violations as early as 2001.  This would appear to be enough to place Carrier on inquiry notice, which in turn would require Carrier diligently to investigate its possible claim. *Dayco*, 523 F.2d at 394 (holding that government investigation into alleged antitrust violations prompted duty to investigate).  Despite Carrier's failure to uncover the cartel, however, Carrier's complaint sufficiently alleges "reasonable diligence" in the investigation it undertook upon learning of the possible conspiracy.  Indeed, this is not a instance in which the plaintiff presented a "mere allegation of due diligence without asserting what steps were taken." *Id.*  Rather, Carrier alleges that prior to December 2003, an employee with the Global Purchasing Department named Fred Benedict contacted several copper tubing suppliers to ask them about the alleged conspiracy, but was unable to procure any information.  Carrier's examination of the defendants' public statements and filings also turned up no information relating to a possible cartel or other anticompetitive conduct.  Later, after acquiring additional information from the EC decision, which Carrier asserts "provided the first means for beginning an analysis of cartel behavior and its effect on Carrier," Carrier alleges that it retained both outside counsel and an economic consultant to conduct a more thorough investigation.  J.A. at 0055 (Am. Compl. ¶ 111).  We are not prepared to conclude that such efforts were insufficient to satisfy *Dayco*'s "due diligence" requirement at such an early stage of litigation and without the benefit of discovery.  *Cf. Jones v. TransOhio Sav. Ass'n*, 747

F.2d 1037, 1043 (6th Cir. 1984) (noting the panel's reluctance to dismiss fraudulent-concealment allegations prior to discovery); *Duncan v. Leeds*, 742 F.2d 989, 993 (6th Cir. 1984) (addressing the need to construe allegations of fraudulent concealment liberally and in the plaintiff's favor at such an early stage in the litigation). Although we may dismiss a claim of fraudulent concealment when it is obvious from the complaint that the plaintiff conducted absolutely no investigation, *see, e.g.*, *Ruth v. Unifund CCR Partners*, 604 F.3d 908, 911–14 (6th Cir. 2010), when there is some question as to the depth and scope of that investigation, a plaintiff should be allowed to proceed forward.[9] We therefore conclude that, taking the allegations in Carrier's favor as we must at this stage in the litigation, Carrier has adequately pleaded its fraudulent-concealment claim, and its cause of action should not be dismissed as time-barred.

### 2. Personal Jurisdiction

Finally, we address OTO and OCP's argument concerning personal jurisdiction. "To comply with due process, a court's exercise of its power over an out-of-state defendant must not offend traditional notions of fair play and substantial justice." *Indah v. U.S. Sec. & Exchange Comm'n*, 661 F.3d 914, 920 (6th Cir. 2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)) (internal quotation marks omitted). Personal jurisdiction comes in two varieties: specific jurisdiction, which "'is confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction,'" and "'general, all-purpose jurisdiction.'" *Id.* (quoting *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ---U.S.----, 131 S. Ct. 2846, 2851 (2011)).

---

[9]Outokumpu argues that the panel's decision in *Gumbus v. United Food & Commercial Workers Int'l Union*, Nos. 93-5113, 93-5235, 1995 WL 5935 (6th Cir. Jan. 6, 1995), *cert. denied*, 516 U.S. 811 (1995), is to the contrary. We are not bound by *Gumbus*, however, as it is an unpublished decision. Moreover, our previous cases—including *Campbell v. Upjohn Co.*, 676 F.2d 1122 (6th Cir. 1982), which *Gumbus* cites in support of the proposition that inquiry to company officials is insufficient to constitute due diligence—have not suggested that reliance on company assurances as a matter of law always falls short of demonstrating the requisite due diligence. *Campbell* instead utilizes a more fact-based approach to the question whether reliance on oral assurances was a reasonable investigation under the circumstances. Although we determined that such reliance was not reasonable in that case given that the plaintiff already knew that he had substantial cause to mistrust the words and intentions of the officers on whose assurances he claimed to rely, *id.* at 1128, that conclusion does not compel recognition of a per se rule barring the use of direct inquiries to a company as a reasonable means of investigation.

"The plaintiff bears the burden of establishing that [personal] jurisdiction exists." *Theunissen v. Matthews*, 935 F.2d 1454, 1458 (6th Cir. 1991). "[I]n the face of a properly supported motion for dismissal, the plaintiff may not stand on his pleading but must, by affidavit or otherwise, set forth specific facts showing that the court has jurisdiction." *Id.* A district court, in its discretion "may decide the motion upon the affidavits alone; it may permit discovery in aid of deciding the motion; or it may conduct an evidentiary hearing to resolve any apparent factual questions." *Id.* Given that the district court here never addressed personal jurisdiction, only the first option is available on appeal. Thus, Carrier's burden is "relatively slight," *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.*, 882 F.2d 1087, 1089 (6th Cir. 1989) (internal quotation marks omitted), *cert. denied*, 493 U.S. 1058 (1990), and we must "construe the facts in a light most favorable" to Carrier, *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002) (internal quotation marks omitted). In addition, because weighing any controverted facts is inappropriate at this stage, dismissal is proper only if Carrier's alleged facts "collectively fail[] to state a *prima facie* case for jurisdiction." *Theunissen*, 935 F.2d at 1459.

For Sherman Act claims, 15 U.S.C. § 22 authorizes service of process over an antitrust defendant "wherever it may be found." When Congress has enacted such nationwide service of process statutes, personal jurisdiction exists whenever the defendant has "sufficient minimum contacts with the *United States*" to satisfy the due process requirements under the Fifth Amendment. *Med. Mut. of Ohio v. deSoto*, 245 F.3d 561, 566–67 (6th Cir. 2001) (emphasis added); *cf. Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229, 1237–39 (6th Cir. 1981) (indicating without expressly deciding that 15 U.S.C. § 22 permits nationwide process). This inquiry parallels the more traditional personal-jurisdiction analysis under which a defendant must have "'minimum contacts'" with the forum state pursuant to the state's long-arm statute. *See Med. Mut. of Ohio*, 245 F.3d at 566–67.

Because Carrier appears to assert only specific jurisdiction, our minimum-contacts analysis is likewise limited to that issue. Thus, to establish personal jurisdiction in this case, Carrier must adequately show the following elements in accordance with the

well-established test set forth in *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374, 381 (6th Cir. 1968):

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

Applying that test here but analyzing contacts with the United States, we conclude that the district court had specific jurisdiction over the Finnish Outokumpu entities based on their ties to the United States.

Looking first to purposeful availment, we must determine whether OCP and OTO have "engaged in some overt actions connecting [them] with the forum state." *Fortis Corporate Ins. v. Viken Ship Mgmt.*, 450 F.3d 214, 218 (6th Cir. 2006) (internal quotation marks omitted). With respect to OCP, Carrier argues that the company had sufficient contacts with the United States both independently and through its subsidiaries. In support of OCP's independent contacts, Carrier points to exhibits indicating that certain OCP officers lived in the United States and that OCP also sent personnel from Finland to work on the Carrier account on its behalf. Carrier also points to an affidavit indicating at least one instance in which OCP employees traveled to the United States to conduct business with Carrier and to reports indicating that OCP imported a certain amount of copper tubing into the United States. Similar facts support Carrier's claim that, because of the close interrelationship between OCP and its U.S. subsidiaries, the contacts of the U.S. subsidiaries can be attributed to OCP. Specifically, Carrier asserts that in addition to residing in the United States, many high-ranking OCP executives held day-to-day management responsibilities within the U.S. subsidiaries, and that the subsidiaries' boards of directors were dominated by OCP personnel. Carrier also points to evidence suggesting that OCP used its subsidiaries as agents responsible for forwarding copper tubing imports to customers like Carrier in the United States.

In contrast to its argument regarding OCP, Carrier's argument for personal jurisdiction over OTO rests entirely on the assertion that OCP's jurisdictional contacts can be attributed to OTO. In its complaint, Carrier alleged that OTO had "effective control over the commercial policy and business decisions of its subsidiaries, and did business through its subsidiaries." J.A. at 0028 (Am. Compl. ¶ 25). This was possible because of OCP's status as a wholly owned subsidiary of OTO over which OTO publicly claimed to retain full operational control. R. 61-3 (Resp. in Opp'n to Mot. to Dismiss Am. Compl., Ex. 10 at 64). Such control is further supported by Carrier's allegation that OTO executives continue to dominate OCP's board of directors and by the EC's finding that OCP lacked any "real business autonomy." *Id.* ¶ 27.

This circuit has adopted the alter-ego theory of personal jurisdiction, which "provides that a non-resident parent corporation is amenable to suit in the forum state if the parent company exerts so much control over the subsidiary that the two do not exist as separate entities but are one and the same for purposes of jurisdiction." *Estate of Thomson v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 362 (6th Cir. 2008). Taking Carrier's pleadings and supporting affidavits in its favor, we conclude that the above allegations facially support the application of this theory with respect to both OCP and OTO. *Cf. Third Nat'l Bank*, 882 F.2d at 1090 (finding personal jurisdiction over a parent company that, among other things, was a 100% owner of the subsidiary and had directors serving on the subsidiary's board).

Furthermore, to the extent that the allegations relate specifically to Outokumpu's anti-competitive conduct toward Carrier, the contacts are "enhanced" by the *Calder*-effects doctrine. *Air Prods. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 552–53 (6th Cir. 2007). In *Calder v. Jones*, 465 U.S. 783 (1984), the Supreme Court held that a plaintiff can establish personal jurisdiction when it alleges that the defendant "expressly aimed" tortious conduct at the forum in question and the "brunt of the harm" is felt there. *Calder*, 465 U.S. at 789; *see also Neal v. Janssen*, 270 F.3d 328, 331 (6th Cir. 2001) ("[E]ven a single act by [a] defendant directed toward [the relevant forum]

that gives rise to a cause of action can support a finding of minimum contacts sufficient to exercise personal jurisdiction without offending due process.").

Here, the conspiracy in which OCP and OTO allegedly participated had an explicit geographical focus. According to the complaint, one of the main pillars of the conspiracy was allocating Carrier's U.S. business to the Outokumpu defendants, thereby forcing Carrier to pay higher prices in the United States. Such conduct serves as a paradigmatic example of "expressly aiming" tortious conduct. Carrier has thus sufficiently alleged purposeful availment under the *Southern Machine* test. As for the second part of the *Southern Machine* test, we conclude that Carrier's cause of action "arises from" its U.S. contacts. To satisfy this factor, we "require[] only that the cause of action, of whatever type, have a substantial connection with the defendant's [in-forum] activities." *Bird*, 289 F.3d at 875. Insofar as the complaint is premised on the alleged harm that Outokumpu "expressly aimed" at Carrier, that lenient standard is easily met. *See Air Prods.*, 503 F.3d at 552.

Finally, although we recognize the need to use particular caution when extending personal jurisdiction to foreign defendants, *see Fortis*, 450 F.3d at 223, because OTC and OCP have not argued that exercising jurisdiction over them would be "unreasonable" under the third prong of the *Southern Machine* test, they have not rebutted the "inference of reasonableness" that arises when the plaintiff sufficiently demonstrates the first two prongs of that test. *Air Prods.*, 503 F.3d at 554 (internal quotation marks omitted). We therefore conclude that the district court had personal jurisdiction over OTO and OCP.[10] We emphasize however, that our holding is based only on a facial analysis of Carrier's pleadings and exhibits. OTO and OCP are free to seek an evidentiary hearing or to raise this issue again at the summary-judgment stage. *See Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 893 (6th Cir. 2002).

---

[10]In the related *American Copper* case, the district court also determined that it had personal jurisdiction over OTO and OCP. No. 04-2771-DV (W.D. Tenn. June 1, 2006) (unpublished opinion).

## III.  CONCLUSION

For the reasons stated above, we **REVERSE** the district court's judgment with respect to Outokumpu Oyj, Outokumpu Copper Products Oy, Outokumpu Copper (U.S.A.), Inc., and Outokumpu Copper Franklin, Inc. and **REMAND** for further proceedings.