McKEAGUE, Circuit Judge,
dissenting.
The analysis of the majority opinion is facially appealing, but it comes to the wrong result. The difference between our two views stems from our different starting points. The majority relies on a general rule favoring resolution of doubts against removal. But in this context, our precedents require us to resolve doubts in favor of the party or parties invoking federal jurisdiction. Instead of abiding by these precedents, my colleagues have embarked on a more searching (and speculative) inquiry than is warranted or permitted at this stage of the case. I respectfully dissent.[1]
I
We all agree that the district court treated plaintiffs’ motion to remand as a facial attack. A facial attack, like a motion to dismiss under Fed. R. Civ. P. 12(b)(6), tests the sufficiency of the pleadings—such as the notice of removal and the complaint—and well-pled fact allegations are accepted as true. Wayside Church v. Van Buren Cty., 847 F.3d 812, 816-17 (6th Cir. 2017); Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 440 (6th Cir. 2012); Gentek Bldg. Prod., Inc. v. Sherwin-Williams Co., 491 F.3d 320, 330 (6th Cir. 2007). A factual attack, on the other hand, raises a factual controversy requiring the district court to weigh the conflicting evidence in determining whether jurisdiction exists. Wayside, 847 F.3d at 817. Where, as here, “the *451 district court treated the challenge as a facial challenge and made no factual findings in reaching its decision, the appeal is treated the same way.” Id.
So, the parties’ allegations should be the focus of our inquiry. The district court, rather conspicuously, focused only on plaintiffs’ allegations and found no basis for federal jurisdiction in their assertion of state-law tort claims. The majority opinion acknowledges that defendants’ notice of removal has an important role to play, but describes its allegations only in summary fashion. Let’s take a closer look.
In the notice of removal, the MDEQ defendants aver, with reference to plaintiffs’ Count I claim for gross negligence and Count II claim for intentional misconduct, that their actions complained of were taken in the course and scope of their employment with the MDEQ in their monitoring and testing of Flint’s drinking water under federal law, the Safe Drinking Water Act (SDWA), 42 U.S.C. § 300f et seq., and under oversight of a federal agency, the EPA. R. 1, Notice of Removal ¶¶ 6-7, Page ID 3-4. The notice of removal states “[t]his is not a garden variety state law tort action that merely references a federal law or statute.” Id. at ¶43, Page ID 14. Rather, the MDEQ defendants assert that Plaintiffs’ claims are “inextricably intertwined with the construction, interpretation and effect of the SDWA and the LCR [Lead and Copper Rule].” Id. at ¶ 41, Page ID 14. More specifically, for example, they allege:
29. The Removing Defendants are being sued for allegedly failing to adhere to federal law, due to their alleged lack of compliance with the SDWA and LCR’s detailed monitoring, testing, sampling, and notification requirements in overseeing the Flint water system, as administered by Removing Defendants under the EPA’s direction and control.
⅝ * ⅜ ⅜
40. Plaintiffs’ complaint both specifically and implicitly alleges that these removing Defendants (along with other individual Defendants consenting to this removal) had duties to Plaintiffs based on the federal SDWA and LCR standards, regulations, monitoring, and testing requirements that were purportedly not followed and give rise to Plaintiffs’ various causes of action.
41. Plaintiffs’ claims are inextricably intertwined with the construction, interpretation, and effect of the SDWA and the LCR. If these and other Defendants establish that these federal laws and regulations were not violated, Plaintiffs’ claims against these Removing Defendants are defeated.
42. Plaintiffs’ gross negligence claims depend on a question of federal law, primarily whether these Removing Defendants complied with the SDWA and LCR during their oversight of the Flint water system. There are no alternative theories supporting gross negligence that do not implicate the SDWA and/or LCR, as the Removing Defendants are being sued for carrying out the EPA’s duty, as delegated to Removing Defendants, to ensure that public water systems such as Flint comply with the SDWA and LCR.
[[Image here]]
44. Whether these and other Defendants violated the SDWA and LCR is disputed. The EPA has admitted that the LCR is ambiguous and subject to different possible interpretations and constructions when applied to this particular situation.
45. There is substantial need for uniform interpretation of the SDWA and LCR as it applies to Flint, and the other 155,000 public water systems subject to the SDWA and LCR, that provide water *452 to almost all Americans across the United States.
Id. at ¶¶ 29, 40-42, 44, 45, Page ID 10, 14, 15 (footnotes omitted).
In addition, the notice of removal devotes nearly five pages to spelling out the relationship between the MDEQ and the EPA in sharing responsibility for monitoring water quality and enforcing compliance with standards established in the SDWA and its regulations, like the LCR. Id. at 6-10, Page ID 6-10. The following paragraphs are illustrative:
18. The SDWA directs the EPA to promulgate national primary drinking water standards and to regulate public water systems. See 42 U.S.C. § 300f et seq.
19. Specifically, with respect to the regulation of lead and copper, the EPA, in 1991, promulgated national primary drinking water regulations (“NPDWRs”) for controlling lead and copper in public drinking water. 56 Fed. Reg. 26460 (June 7, 1991). These regulations are known as the “Lead and Copper Rule” or “LCR” and are found at 40 C.F.R. §§ 141.80, et seq.
20. The EPA’s LCR applies to public water systems such as the City of Flint. See 40 C.F.R. § 141.80(a). Generally speaking, it requires those water systems to monitor the levels of lead and copper at consumers’ taps and, under a number of different circumstances, requires those systems to employ various treatment techniques such as corrosion control treatment, source water treatment, lead service line replacement, and public education. 40 C.F.R. §§ 141.80(b)—(h).
21. The SDWA authorizes the EPA to delegate primary enforcement responsibility for public drinking water systems to states where the EPA determines, inter alia, that the state: (1) has adopted drinking water regulations that are no less stringent than the primary drinking water regulations promulgated by the EPA; (2) has adopted and is implementing adequate procedures for the enforcement of such State regulations, including conducting such monitoring and making such inspection as required by the EPA; and (3) will keep such records and make such reports with respect to its activities as required by the EPA. See 42 U.S.C. § 300g-2; see also 40 C.F.R. §§ 142.10, 142.11.
22.The SDWA, however, reserves tremendous oversight authority to the EPA, including mandatory EPA intervention in the form of notifications, advice, technical assistance, and, failing timely and sufficient state action, enforceable orders and inspections to bring water systems into compliance with federal standards. See 42 U.S.C. § 300g-3; see also 40 C.F.R. §§ 141.82(i), 141.83(b)(7), 142.19, 142.30, and 142.34.
[[Image here]]
24. If the EPA determines that a state no longer meets its requirements, the EPA is required to initiate proceedings to withdraw primacy approval. See 40 C.F.R. §§ 142.17(a)(2). If the EPA believes a state has abused its discretion in making corrosion control or source water treatment determinations in a substantial number of cases, or in cases affecting a substantial population, the EPA may issue an order establishing federal treatment requirements for a 'public water system. See 40 C.F.R. § 142.19(a) (emphasis added).
⅜ * ⅜ ⅜
28. Furthermore, EPA’s direction and control over the MDEQ’s implementation of the SDWA and LCR is most clearly demonstrated by the EPA’s January 21, 2016 emergency order, whereby the EPA began monitoring and testing *453 the Flint water system and ordered the MDEQ to take specific actions related to Flint. Exhibit J.
R. 1, Notice of Removal ¶¶ 18-22, 24, 28, Page ID 6-10 (footnotes omitted).
The allegations of the notice of removal thus, on their face, aver that plaintiffs’ “garden variety state law tort action” is premised on alleged violations of duties stemming from federal standards established by the SDWA and the LCR—stan-dards the MDEQ defendants were charged with monitoring and enforcing by virtue of the EPA’s delegation of authority to them.[2]
II
The district court paid little heed to these allegations, and my colleagues, by essentially ignoring its decision, implicitly acknowledge that the district court’s analysis is flawed. Moreover, the majority acknowledges that several of the allegations in the notice of removal facially support a finding that the MDEQ defendants “acted under” the oversight or direction of the EPA. For instance, the majority recognizes (a) that the EPA delegated primary SDWA enforcement authority to the MDEQ; (b) that the MDEQ receives funds from the EPA to perform the required monitoring and enforcement; (c) that the EPA would have to enforce the SDWA in Michigan if the MDEQ did not have primary enforcement authority; (d) that the MDEQ was required to submit reports to the EPA detailing compliance with the standards established by the SDWA and the LCR; (e) that during the course of the MDEQ’s monitoring of the Flint water system, the MDEQ defendants received numerous communications and recommendations from the EPA, culminating in the EPA’s January 2016 Emergency Administrative Order attached to the notice of removal; and (f) that the Emergency Order, by establishing the EPA’s own monitoring of the Flint water system and ordering the MDEQ defendants to take myriad actions to assist the EPA, evidences the EPA’s supervision and control.
Yet, rather than accepting these allegations at face value, as we are obliged to do in response to plaintiffs’ facial attack, the majority opinion scrutinizes each point individually and explains why each, viewed in isolation, is insufficient to persuade that the removing defendants have carried their burden of establishing jurisdiction. To justify this approach, the majority observes that “removal statutes are to be strictly construed, and all doubts should be resolved against removal,” citing Harnden v. Jayco, Inc., 496 F.3d 579, 581 (6th Cir. 2007), and Eastman v. Marine Mech. Corp., 438 F.3d 544, 549 (6th Cir. 2006). *454 But in each of these cases, removal was based on the defendant’s assertion that the plaintiffs complaint implicated either the requisite amount in controversy or a question of federal law that justified federal jurisdiction. It stands to reason that the court’s facial examination of the “unadorned snapshot” of the plaintiffs complaint in each case would be accompanied by a “presumption” resolving doubts in favor of the plaintiff, the drafter of the pleading under examination. To carry its burden under those circumstances, the removing defendant was aptly required to overcome the presumption favoring the plaintiffs construction of its own pleading.
■ The federal officer removal officer statute, however, is a different animal. The fundamental basis for removal under this statute is the status of the defendant as a federal officer or one acting under a federal officer. This status would ordinarily be set forth in the defendant’s notice of removal, not in the plaintiffs complaint. It is for this' reason, ostensibly, that “doubts” arising under a facial attack on federal officer removal are to be resolved in favor of removal. In the instant case, plaintiffs’ facial attack on the jurisdictional allegations in the notice of removal is thus accompanied by a presumption in favor of the defendants’ construction of their own pleading. It follows that the removing defendants’ allegations are to be read in the light most favorable to them and any reasonable doubts should be resolved in their favor.
The federal officer removal statute permits removal of actions brought against “(1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office....” 28 U.S.C. § 1442(a)(1) (emphasis added).
“The federal officer removal statute is not narrow or limited.” Willingham v. Morgan, 395 U.S. 402, 406, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969) (internal quotation marks omitted). “At the very least, it is broad enough to cover all cases where federal officers can raise a colorable defense arising out of their duty to enforce federal law.” Id. at 406-07, 89 S.Ct. 1813. One of the primary purposes is “to have such defenses litigated in the federal courts.” Id. at 407, 89 S.Ct. 1813. “This policy should not be frustrated by a narrow, grudging interpretation of § 1442(a)(1).” Id.
The statutory language highlighted above makes clear that removal is available to some persons who are not federal officials, i.e., persons who are under the direction or instruction or guidance or control of a federal superior and who assist or help carry out the superior’s duties. Watson v. Philip Morris Cos., Inc., 551 U.S. 142, 151-52, 127 S.Ct. 2301, 168 L.Ed.2d 42 (2007). The MDEQ defendants contend they are such persons and their notice of removal is replete with detailed allegations tending to substantiate their position. Under the regulatory scheme established by the SDWA, as described in the notice of removal, the MDEQ defendants have stated facts which, if proved, could support a finding that they were, in their enforcement of water quality standards, acting under the guidance and oversight and, ultimately, direction of the EPA (i.e., after issuance of the Emergency Order).
These allegations are to be accepted as true for purposes of this facial assessment. Wayside, 847 F.3d at 816; Gentek, 491 F.3d at 330.[3] If the allegations make out a *455 colorable basis for federal jurisdiction, then jurisdiction is deemed to exist. Gen-tek, 491 F.3d at 330. And to the extent the allegations are intertwined with fact questions going to the merits, it is not for the court to muse about what how the record might ultimately be developed. Rather, doubts are to be resolved in favor of removal. The court should ordinarily assume jurisdiction over the case and then address questions going the merits in due course— unless the alleged basis for jurisdiction is “clearly immaterial or insubstantial.” Id. (quoting Williamson v. Tucker, 645 F.2d 404, 415-16 (5th Cir. 1981)); see also Carrier, 673 F.3d at 443-44; Papp v. Fore-Kast Sales Co., Inc., 842 F.3d 805, 811 (3d Cir. 2016). The lengths to which the majority opinion goes to explain why defendants’ allegations are colorable but not persuasive (including a survey of the history and purposes of the federal officer removal) belie any notion that defendants’ allegations are “clearly immaterial or insubstantial.” In my opinion, the majority’s analysis embarks on an excursion far beyond the boundaries that circumscribe a proper examination of the sufficiency of the pleadings.
Ill
Because the MDEQ defendants’ jurisdictional allegations are not clearly immaterial and insubstantial, any doubts as to whether defendants will be able to prove the alleged facts—i.e., doubts about what the evidence will ultimately show, and about the actual nature of the shared regulatory relationship of the EPA and the MDEQ defendants, and about the extent to which the defendants’ actions were subject to the guidance or oversight of the EPA—are all to be resolved at this stage in defendants’ favor. I express no opinion on the likelihood .that defendants will be able to prevail on the merits of their defenses. In question here is simply whether they have set forth colorable grounds war-' ranting a federal forum. I believe they have alleged facts that, if proved, would support findings that they acted under a federal officer, under color of federal law, and have a colorable federal defense. See Bennett v. MIS Corp., 607 F.3d 1076, 1085 (6th Cir. 2010). This is enough to withstand plaintiffs’ facial attack and permit federal officer removal. Because the district court, like my colleagues, disregarded the boundaries governing plaintiffs’ facial attack in reaching a different conclusion, I would reverse the order of remand.
Accordingly, I respectfully dissent.

. Like the majority, I focus on the first of the removing defendants’ two asserted bases for removal, the federal officer removal statute.

. In fact, the removing defendants’ contention that plaintiffs' tort claims are “inextricably intertwined” with enforcement of these standards was, in effect, all but conceded by plaintiffs’ counsel during oral arguments. Pressed to identify the source of the duty allegedly breached by the MDEQ defendants, under Michigan law, whether statutory or case law authority—independent of the SDWA and the LCR—plaintiffs' counsel defaulted. Counsel was simply unable to identify a state-law source of the duty owed by the MDEQ defendants to plaintiffs, the breach of which allegedly amounted to gross negligence.
Counsel’s failure in this regard is not surprising; it’s entirely consistent with plaintiffs' amended complaint, which includes several references to the federal LCR, but does not name a state-law source of the duty allegedly breached. This deficit in plaintiffs' position does not dictate that the removing defendants were acting as or under federal officers. By negative implication, however, it enhances the facial "color” in defendants' allegations that their complained-of actions were taken pursuant to federal authority.

. Of course, if plaintiffs were not content to accept the allegations as true, they had the *455 option of asserting a factual attack, but that's not how the district court treated their motion to remand.